**Milo E. GLASS, et al., Plaintiffs,**

v.

**IDS FINANCIAL SERVICES, INC.; IDS Life Insurance Company; and IDS Financial Corporation, Defendants.**

**Donald STEPHENS, et al., Plaintiffs,**

v.

**IDS FINANCIAL SERVICES, INC.; IDS Life Insurance Company; and IDS Financial Corporation, Defendants.**

**Civ. Nos. 4–89–76, 4–89–115.**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 21, 1991.

See also 137 F.R.D. 262.

Stephen J. Snyder, David P. Pearson, Laurie A. Knocke, and Winthrop & Weinstine, Minneapolis, Minn., for plaintiff.

John D. Levine, Janice Symchych, Roy A. Ginsburg, Michael J. Wahoske, and Dorsey & Whitney, Minneapolis, Minn., for defendant.

Lloyd B. Zimmerman, E.E.O.C., Minneapolis, Minn., for intervenor-plaintiff.

## ORDER

DOTY, District Judge.

### INTRODUCTION

Plaintiffs, thirty-two former division managers with IDS Financial Services, Inc., IDS Life Insurance Company and IDS Financial Corporation (collectively referred to "IDS"), allege that IDS discriminated against them in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34.[1] Various plaintiffs also assert state law claims, including intentional infliction of emotional distress claims.[2] IDS and plaintiffs brought twenty-one sep-

1. Plaintiffs filed the underlying complaint on January 27, 1989. The court certified the case as an opt-in class action under the ADEA on September 26, 1989.

2. At the present time, the following plaintiffs assert intentional infliction of emotional distress claims: Rosevelt Bass, D. Vincent Enright, E. John Evans, Gerald Gant, Milo E. Glass, Maurice Harrington, Roger Huebner, C. Donald Ladd, Thomas LoMacchio, Barry Mates, Gayle Parrack, E.H. Poole, Agnes Savadel, Thomas Sinyard, C. Thomas Turner, William Walters and Robert Wilber.

arate motions on various issues. This order will set forth the facts and law relevant to each motion in turn.[3]

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552. With this standard at hand, the court will examine the various motions.

### 1. Defendants' Motion for Dispositive Sanctions

■ IDS seeks dispositive sanctions for plaintiffs' alleged violations of Federal Rules of Civil Procedure 11, 37(b) and 53(g), 28 U.S.C. § 1927, and the "underlying duty to litigate fairly and honestly."[4] IDS specifically alleges that plaintiffs engaged in sanctionable misconduct relating to the piggybacking issue.[5] IDS also seeks attorneys' fees associated with various motions and discovery matters. Such sanctions are within the court's discretion. *See, e.g., Chambers v. NASCO, Inc.*, — U.S. —, 111 S.Ct. 2123, 2132–33, 115 L.Ed.2d 27 (1991) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980)). Based on a review of the file, record and proceedings, the court denies IDS's motion for dispositive sanctions and attorneys' fees.

### 2. Defendants' Motion for Partial Summary Judgment on the Sufficiency of the Glass Charge

On September 2, 1986, Jerolene Glass ("Mrs. Glass"), the wife of plaintiff Milo Glass ("Glass"), called the Iowa Civil

---

3. For purposes of analysis, the court combined defendants' motion for summary judgment on plaintiffs' wrongful chargeback claims based on state law with plaintiffs' motion for partial summary judgment on defendants' Production Validation Schedule ("PVS") chargebacks. The court also combined defendants' motion for summary judgment on plaintiffs' ERISA claims with plaintiffs' motion for summary judgment on their claims under the Career Distributors Retirement Plan.

4. In their response, plaintiffs also seek sanctions, charging that defendants destroyed data that was originally attached to a November 1986 memorandum from Michael Svobodny to Richard Weller. The court declines to rule on plaintiffs' request because it is not properly before the court.

5. As discussed more fully in the next section, twenty-three plaintiffs seek to piggyback on the ADEA charge filed by plaintiff Milo Glass with the Iowa Civil Rights Commission in September 1986.

Rights Commission ("ICRC") on behalf of her husband and read a written statement to Robert King, an intake employe of ICRC ("King"). The parties hotly dispute the actual contents of that statement. In her affidavit dated April 19, 1989, Mrs. Glass claimed that the written statement included the following allegations:

IDS is gaining further by the demotion of other Division Managers who are in similar positions as I am. They are demoting and terminating older men and replacing them with other persons who are much younger in age generally in their thirties.

She also testified that she told King that other division managers had been demoted and "named J.R. Klukas and Jerry Gant." She further testified that she had ended their conversation "by stating: 'M.E. Glass is one of many IDS Financial Services is replacing with younger persons.'" IDS contends, however, that those portions of Mrs. Glass's affidavit is false.[6]

The audio tape of that telephone conversation shows that Mrs. Glass actually told King the following:

KING: And the regional manager indicated that on April 30th that he was going to be replaced as divisional manager with a younger man?

MRS. GLASS: Yes. Yes. Well, he named the man who happens to be younger, yes. Decidedly younger. Now they have done this in four other ... right at the same time, with four other, umm, at four other offices. We do know that on contact with one of the persons that they did this, divisional managers that they replaced, he was placed in another position lower.

(Transcript of audio tape, typed by Debra Maher on April 10, 1990.) The parties further dispute whether additional oral communications occurred between the Glasses and the ICRC. It is undisputed, however, that Glass filed a timely written charge with the ICRC in September 1986 that stated:

I believe my age was a factor in the following incident:

(1) I am a 59 year old male and I have worked for the IDS Financial Services, Inc. Company for 35 years. I was promoted to Divisional Manager some 15 years ago and increased my commission income which is based on volume of business, from $25,000 per year to $128,000 per year with the company paying all office expenses. On April 30, 1986, I was told by the Regional Manager that effective May 21, 1986, I would be demoted to a District Manager's position and would be replaced as Divisional Manager by a less senior, younger co-worker in his mid-thirties. I was also told that as District Manager I would be required to pay all office expenses.

It is further undisputed that Glass filled out an intake questionnaire alleging that:

Younger persons are being promoted to a Divisional Sales Manager status and are employees of the Company. Some are receiving salaries while others are in high commission income. Older Divisional Sales Managers are being terminated and are being offered self-employeed [sic] positions. Some of the younger men promoted to Divisional Sales Managers are: Brian Rucks, Roy Evanovich, Mitre Kutanovski, Lorenzo Wilson. Some of the older men demoted from Divisional Sales Managers are: J.R. Klukas, Jerry Gant, M.E Glass, Thor Nygren, Carl Fazzini.

Although the parties dispute whether Glass's intake questionnaire was prepared at the same time as his written charge, it is clear that the ICRC had his written questionnaire in its files prior to its preparation of an amended charge on January 21, 1987, but never added those allegations to Glass's charge or sent IDS a copy of his intake questionnaire. Plaintiffs also proffer evidence that the ICRC, during the period of time in which Glass filed his charge, handled every charge as an individual charge, no matter what the claimant actually alleged.[7]

---

6. The fact that King has changed his testimony more than once does not help this dispute.

7. As this court previously noted:

the Iowa Commission was apparently without authority to draft a classwide charge and con-

IDS again moves for partial summary judgment on the issue of whether Glass's administrative charge is sufficient to permit twenty-three plaintiffs to piggyback on that charge.[8] The court has entered three prior orders on the sufficiency of Glass's charge.[9] In its first order, dated September 27, 1989, the court denied IDS's motion for partial summary judgment, finding that Glass's charge of discrimination, combined with his intake questionnaire and the statement read by Mrs. Glass over the telephone to the ICRC (as described in her affidavit), provided sufficient information to allow the ICRC an "opportunity to eliminate the alleged unlawful practices through informal methods of conciliation", thereby fulfilling one of the two purposes underlying the ADEA charge filing requirement. *Glass v. IDS Fin. Servs.*, No. 4–89–76, slip. op. at 6 (D.Minn. September 27, 1989) (Glass I) (quoting *Kloos v. Carter–Day Co.*, 799 F.2d 397, 400 (8th Cir.1986)). The court further stated that the second purpose, providing formal notice to IDS, was not satisfied but found that ICRC had failed in its statutory duty to provide such notice and that plaintiffs should not be penalized by its failure. *Id.* at 7.

After the first order, the parties submitted further evidence on the issue and the court, in an order dated June 22, 1990, reversed the first order and granted IDS's motion for partial summary judgment. *Glass v. IDS Fin. Servs.*, No. 4–89–76 (D.Minn. June 22, 1990) (Glass II). The court based its second order on newly proffered evidence, including a transcript of Mrs. Glass's telephone call to the ICRC that "materially differ[ed] from the statement Mrs. Glass asserted she read to the ICRC." *Id.* at 3. The court found that the

contents of her statement, as reflected by the transcript, and the information contained in Glass's intake questionnaire did not apprise the ICRC of the class nature of Glass's claim. The court thus concluded that neither of the purposes underlying the charge-filing requirement had been fulfilled and granted IDS's motion for partial summary judgment.

The court's third order, issued August 8, 1990, denied partial summary judgment and reinstated the first order, finding a material fact dispute based on "additional evidence which demonstrated that there may have been additional conversations between Mrs. Glass and [the ICRC] prior to the ICRC's drafting of the formal charge, and that even the taped conversations between Mrs. Glass and [the ICRC] may have been only partially recorded." *Glass v. IDS Fin. Servs.*, No. 4–89–76, slip. op. at 2 (D.Minn. August 8, 1990) (Glass III).

IDS argues that the court should again grant partial summary judgment on three grounds. IDS first contends that in its third order, dated August 8, 1990, the court improperly considered oral communications as part of Glass's charge. IDS also asserts that newly proffered deposition testimony calls into question affidavits submitted by plaintiffs in July of 1990 in opposition to the motion that was the subject of the third order. Finally, IDS contends that even if the oral communications were properly considered part of Glass's charge, that charge is still insufficient to give IDS adequate notice of any class claims under Eighth Circuit law, specifically *Kloos v. Carter–Day Co.*, 799 F.2d 397 (8th Cir.1986) and *Ulvin v. Northwestern National Life Ins.*

---

ciliate with defendants on a class basis even though the commission had been informed of a class claim and even if Glass had the legal expertise to specifically request the Iowa Commission to insert a class claim in the formal charge given defendants.
*Glass v. IDS Fin. Servs.*, No. 4–89–76, slip op. at 6 (D.Minn. Aug. 8, 1990).

**8.** IDS contends that the claims of those twenty-three plaintiffs are untimely unless they can piggyback on Glass's charge. As discussed *in-*

*fra*, the court rejects this contention in light of the evidence proffered regarding a pattern or practice of age discrimination.

**9.** As the court noted in its third order, "failure of counsel to come forth with the crucial facts at the appropriate time has caused delay and confusion in this matter that is regrettable." *Glass v. IDS Financial Servs., Inc.*, No. 4–89–76, slip. op. at 1 n. 1 (D.Minn. August 8, 1990). Unfortunately, that observation remains true more than one year later.

**1040**

*Co.*, 943 F.2d 862 (8th Cir.1991).[10] The court will address each contention in turn.

### A. Oral Communications

[2] IDS first claims that the court, in its third order, improperly considered oral communication as part of Glass's charge. IDS argues that "oral communications cannot, as a matter of law, constitute the Charge of Discrimination." Courts apply the following standard when evaluating communications alleged to be charges:

> [i]n order to constitute a charge that satisfies the [statutory] requirement ..., notice to the EEOC must be of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Acts' machinery.

*Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 542 (7th Cir.1988) (citing *Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir.1983)); *cf. Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 283 (8th Cir.1983) (letter signed by claimant may be construed as charge). Courts generally hold that oral communications alone are insufficient to constitute a charge. *See, e.g., Woodard v. Western Union Tel. Co.*, 650 F.2d 592, 593–94 (5th Cir.1981) (claimant's oral communications gave insufficient notice of an intent to sue); *Reich v. Dow Badische Co.*, 575 F.2d 363, 368 (2d Cir.1978) (oral communications, without written charge, are not sufficient); *Greene v. Whirlpool Corp.*, 708 F.2d 128, 130 (4th Cir.1983) (claimant never filed a written charge and the oral communications merely constituted "a request for information concerning age discrimination"). IDS, however, misinterprets the third order; for purposes of summary judgment, the court considered evidence of oral communications as perhaps comprising a portion of Glass's charge, but his charge clearly involved more than mere oral communications. *Cf. Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294, 301–02 (N.D.Cal.1991) (EEOC may receive notice of class claims from other sources in addition to actual charges filed).

Moreover, plaintiffs allege that the ICRC failed to reduce all of the relevant oral communications to writing, contrary to EEOC regulations providing that:

> A charge shall be in writing and shall name the prospective respondent and shall generally allege the discriminatory act(s). Charges received in person or *by telephone* shall be reduced to writings.

29 C.F.R. § 1626.6 (1991) (emphasis added). Thus, the cases on which IDS relies are distinguishable from the present case. The present situation is also unique because the Glass charge was filed with an agency that characterized all charges, whether class or individual, as individual claims. Under such circumstances, the court rejects IDS's claim that oral communications cannot comprise part of Glass's charge. *See also Glass I,* slip op. at 6 (charge consists of "not only the 'charge of discrimination' drafted by the Iowa Commission, but also the statement read over the telephone and the answers to the questionnaire sent to the commission").

### B. Recent Depositions

■■ IDS also proffers deposition testimony that allegedly calls into question various affidavits submitted by plaintiffs pursuant to the motion that was the subject of the court's third order. This evidence, however, merely affirms that material fact disputes exist concerning the sufficiency of the Glass charge. *See supra.* Moreover, it is not the function of the court when ruling on a motion for summary judgment to resolve existing factual issues through a trial by affidavits. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Thus, the court denies partial summary judgment on the basis of IDS's newly proffered evidence.

### C. IDS's Claims of Inadequate Notice

■■ Under the ADEA, an individual claimant is required to file an administrative charge prior to bringing a civil action.[11]

**10.** IDS brought the *Ulvin* decision to the court's attention by letter dated September 6, 1991. The court allowed the parties to file supplemental briefs in light of that decision.

**11.** *See infra* note 35.

The Eighth Circuit states that the charge-filing requirement serves two purposes:

> First, it provides the state agency or the EEOC with information and 'an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation.' Second, it provides formal notice to the employer and prospective defendant of the charges that have been made against it.

*Kloos*, 799 F.2d at 400 (citation omitted). In a class action, however, class members may piggyback on an individual's timely charge as long as that charge contains either "[a]n allegation of class-wide discrimination or claim of class representation." *Id.* Such a representation should "inform and give notice to the employer that the consequences of an individual plaintiff's charge may 'transcend[ ] an insolated [sic] individual claim.' " *Id.* (quoting *Naton v. Bank of California*, 649 F.2d 691, 697 (9th Cir.1981) (quoting *Bean v. Crocker Nat'l Bank*, 600 F.2d 754, 760 (9th Cir.1979)). Thus, the Eighth Circuit holds that "fair notice of class claims is necessary to satisfy the charge filing requirement of section 626(d) in an ADEA class action." *Id.* at 401 n. 5. IDS contends that Glass's charge is flawed because it failed to provide notice of any potential class claims. The court, however, determines that under *Kloos*, a reasonable jury could find that the Glasses provided the ICRC with "fair notice" of the existence of class claims.[12] First, the audio tape of Mrs. Glass's telephone conversation with King demonstrates that she told him that:

> [IDS has] done this in four other ... right at the same time, with four other, umm, at four other offices. We do know that on contact with one of the persons

that they did this, divisional managers that they replaced, he was placed in another position lower.

Although the audio tape indicates that Mrs. Glass either stuttered or was otherwise having difficulty expressing herself, the court finds that this portion of her statement, which is undisputed, may have been sufficient to give the ICRC "fair notice" of the existence of class claims based on her reference to four other offices in which division managers were subjected to similar treatment.[13] Viewing ADEA plaintiffs as generally inexperienced in legal matters and filing their ADEA charges *pro se*, other jurisdictions have also found general allegations of class-wide age discrimination sufficient to permit plaintiffs to assert class-wide claims. *See, e.g., Church*, 137 F.R.D. at 302 (charge alleging "the company preferred younger managers" and that "younger managers were transferred to other positions rather than discharged" provided sufficient notice of classwide claims); *Levine v. Bryant*, 700 F.Supp. 949, 956 (N.D.Ill.1988) (one charge, alleging that "many employees over 50 years old in managerial positions have been discharged [and] ... replaced by younger employees" found sufficient); *Walker v. Mountain States Tel. & Tel Co.*, 112 F.R.D. 44, 46 (D.Colo.1986) (two charges filed, sufficient notice given by allegation in one that "I have reason to believe that many older employees who were near retirement were forced to retire at the same time I was and in the months following"). Thus, the court concludes that Mrs. Glass's reference to similar situations in four other division offices may have been sufficient to provide fair notice of class claims because the ICRC could have reasonably concluded that

---

**12.** The court notes that the following discussion reaches a different conclusion than that stated in its second order, dated June 22, 1990. After further research, the court concludes that the second order was in error and that material fact disputes exist concerning whether the Glasses provided "fair notice" of the existence of class claims. Thus, the court rejects the analysis in the second order to the extent that it conflicts with this order.

**13.** The court bears in mind that ADEA is a remedial statute to be liberally construed in

favor of its intended beneficiaries. *See, e.g., Heagney v. European American Bank*, 122 F.R.D. 125, 129 (E.D.N.Y.1988) (citing *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 761, 99 S.Ct. 2066, 2074, 60 L.Ed.2d 609 (1979)). The court further notes the prerequisites for an ADEA class action pursuant to 29 U.S.C. § 216(b) (employee may bring action on behalf of "other employees similarly situated") are much less stringent than those for class actions brought under Federal Rule of Civil Procedure 23(b)(3). *See id.* at 127 n. 2.

there were other managers similarly situated to Glass and properly notified IDS of the potential class claims.

The court further finds that Glass's intake questionnaire alone may have been sufficient to provide ICRC with fair notice of the existence of class claims.[14] It is undisputed that Glass's intake questionnaire stated that younger persons were being promoted and older divisional managers were being terminated or offered self-employed positions. In addition, the intake questionnaire specifically named four younger people who had been promoted and five "older men" who had been demoted. *See Anderson v. Montgomery Ward & Co., Inc.*, 852 F.2d 1008, 1010 & n. 3, 1017 (7th Cir.1988) (the fact that a charge mentions other individuals by name is relevant to the determination of whether classwide discrimination is alleged). The ICRC could have reasonably concluded from this language that the consequences of Glass's charge may have transcended an isolated individual claim. *See Kloos*, 799 F.2d at 400. Thus, even if the ICRC did not receive the intake questionnaire until after it received Glass's charge, the ICRC could have properly included class claims when it subsequently amended his charge.[15] *Cf. Best v. St. Clare's Hosp.*, 51 Fair Empl. Prac.Cas. (BNA) 588, 1989 WL 135266 (S.D.N.Y.1989) (letter, describing different forms of discrimination and sent by claimant after filing of original charge, was properly considered an amendment to claimant's charge).

IDS does not allege that the language in the intake questionnaire was insufficient to provide notice of class claims, but instead argues that the language should be ignored because the ICRC never sent the intake questionnaire to IDS nor included the information when it amended Glass's formal charge. As the court previously noted in its third order:

> [d]efendants' position that under no circumstances can they be held to face a class claim unless they receive notice of that claim in the formal charge drafted by the commission effectively would render plaintiffs' statutory right to maintain a class claim through the Iowa Commission void.

*Glass III*, slip op. at 6. In similar circumstances, the Ninth Circuit held that:

> It is the EEOC, not the claimant, who is responsible for notifying the employer of the claims alleged in the EEOC charge. 29 U.S.C. § 626(d) (1988). Thus, the claimant should not be penalized because of the EEOC's own errors.

*Albano v. Schering–Plough Corp.*, 912 F.2d 384, 386 (9th Cir.1990); *see also Steffen*, 859 F.2d at 544 ("The EEOC's failure to act on a charge, however, does not bar a person from maintaining an ADEA action." (citations omitted)); *cf. Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 923 n. 2 (9th Cir.1982) (claimant's right to file a Title VII action will not to be prejudiced by the EEOC's failure to properly process a grievance after it has been filed). In *Albano*, the Ninth Circuit further held that because the EEOC was at fault for failing to adequately investigate plaintiffs' claims of constructive discharge, plaintiffs would be allowed to assert those claims in their civil action even though the claims were not reasonably related to the failure to promote claims originally included in the EEOC charge. *Albano*, 912 F.2d at 388; *see also Best v. St. Clare's Hosp.*, 51 Fair Empl. Prac. Cas. (BNA) 588, 1989 WL 135266 (S.D.N.Y.1989) (EEOC's failure to investigate will not undermine plaintiff's cause of action). As previously stated in its first and third orders, the court declines to penalize plaintiffs because of the ICRC's

---

14. An intake questionnaire without a charge has been found to be sufficient to maintain an age discrimination action. *See, e.g., Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 543–44 (7th Cir.1988).

15. EEOC regulations specifically provide that: a charge may be amended to clarify or amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.
29 C.F.R. § 1626.8(c) (1991).

alleged failure to properly handle either Glass's charge or his intake questionnaire. This conclusion is further bolstered by the evidence demonstrating that during the period in which Glass filed his charge, the ICRC mishandled all potential class claims.[16]

IDS also argues that Glass's charge is insufficient to permit piggybacking of various other plaintiffs pursuant to a recent Eighth Circuit decision that limits the nature and type of claims that can be raised by such opt-in plaintiffs. *Ulvin v. Northwestern Nat'l Life Ins. Co.*, 943 F.2d 862 (8th Cir.1991). In *Ulvin,* the Eighth Circuit held that:

> when the filed charge is quite specific as to the scope of the class claim it raises, opt-in plaintiffs should not be permitted to raise claims that are far outside of that scope. Otherwise, the purposes of requiring an administrative filing would be thwarted; the EEOC would not be able to achieve any meaningful conciliation and employers would not be on notice as to the nature of the potential claims of opt-in plaintiffs.

943 F.2d at 865. Ulvin filed a charge on which various other plaintiffs sought to piggyback. Six of those plaintiffs asserted claims based on defendant's early retirement program. Although Ulvin's charge stated that a general pattern and practice of age discrimination existed, it further alleged only that the defendant had demoted and subsequently fired Ulvin because of his age; his charge did not mention any claims based on the early retirement program nor contain any allegations that the defendant had coerced older employees into accepting early retirement. *Id.* at 864 n. 2. Moreover, Ulvin was not eligible to participate in the early retirement program and he was terminated seven days before the deadline set for eligible employees to announce their decision regarding the program. *Id.* at 865. No early retiree filed a charge with the EEOC until almost one year after that deadline. The Eighth Circuit thus held that:

> Ulvin's EEOC charge did not alert Northwestern to the claims of the early retirees, nor did it create the possibility that the EEOC or Northwestern would attempt to conciliate the claims of early retirees.

> Ulvin's EEOC charge was too narrow to support the discrimination claims of the early retirees.

*Id.* at 865–66. Because Ulvin's charge fulfilled neither purpose for charge filing under *Kloos,* the Eighth Circuit affirmed the district court's ruling that the six participants in the formal early retirement program could not piggyback on Ulvin's charge. *Id.*

█ The court finds that the situation in *Ulvin* is distinguishable from the present case. First, Ulvin's personal situation was not similar to that of the early retirees and his charge gave absolutely no notice that other claimants would seek to attack Northwestern's early retirement program. In addition to allegations concerning Glass's own demotion and removal, the Glasses notified the ICRC of the demotion and removal of other, older division managers; the intake questionnaire specifically named five such division managers. Glass's own situation was thus similar to

---

**16.** For example, Michelle Washington, an employee in the EEOC Milwaukee District Office, which has jurisdiction over Iowa, Wisconsin, and Minnesota, testified in her affidavit dated June 11, 1991, that:

> Under ICRC procedures in effect from 1986 to the present, all age discrimination charges filed with ICRC, whether they allege individual or class claims, are processed by ICRC as individual claims.... With one exception, to the best of my knowledge as the state and local coordinator, ICRC has referred no claims to EEOC for class processing from 1986 to the present.

(Washington Aff. ¶ 4).

Dawn Peterson, an ICRC compliance manager, affirmed that:

> when a group of individuals came to us with a complaint, we would set those up as individual complaints. If individuals were aware of others who may be similarly treated, the individuals were told to have those individuals contact our agency.

(Dep. of 2/14/91, at 242). Although Mrs. Glass's statement specifically referred to other division managers who had been treated similarly, there is no evidence that the ICRC told the Glasses to have those division managers contact the ICRC.

that of the other division managers, and the undisputed allegations contained in Glass's intake questionnaire and Mrs. Glass's telephone call are not so far outside the scope of the proposed class as to bar other opt-in plaintiffs. *See also infra* (discussing similarity of Glass's claims for purposes of IDS's motions on the scope of the class and class decertification).

Unlike Ulvin's charge, Mrs. Glass's reference to four other offices coupled with the information contained in the intake questionnaire may have been sufficient to fulfill at least one of the purposes of charge filing, creating an opportunity to conciliate class claims by informing the ICRC of the existence of other division managers who were similarly situated. *See also Glass I,* slip op. at 6–7. If the ICRC had properly processed the Glass charge, the information received from the Glasses during the intake process may also have been sufficient to fulfill the other purpose of charge filing, to put IDS on notice of the existence of class claims that were similar to Glass's individual claim. Moreover, although IDS never received such notice from the ICRC, plaintiffs also proffer evidence that in 1986 IDS had actual knowledge of the existence of other potential claimants. In response to the Glass charge, IDS prepared a division manager age distribution that apparently indicated a:

> dramatic shift towards a younger group of division managers since 1985. One could conclude that our increased expectations from field managers over the past two years has eliminated a number of the older managers who were not prepared to aggressively grow divisions. [sic] This shift also suggests that we now have in-place many new and improving managers to help us to continue to grow.

(Mem. from M. Svobodny to R. Weller of 12/21/86) ("Svobodny memo").[17]

Ulvin also proffered no direct evidence of a pattern or practice of age discrimination, thus giving further credence to Northwestern's contention that they had no notice of the early retirees' claims. The district court in *Ulvin* specifically found that:

> the evidence shows … that Northwestern['s] … plan to reduce the workforce specifically provided that age may not be a factor in any termination decision. Moreover, the plan's implementation was to be achieved on a decentralized level by local management and to the extent that central authority would be involved, it was only to assure that reductions in force did not have a disparate impact on any protected group.

*Ulvin v. Northwestern Nat'l Life Ins. Co.,* No. 3-88-730, slip op. at 3 (D.Minn. Aug. 8, 1991). Thus, *Ulvin* was a disparate impact case, involving a policy that was neutral on its face. Plaintiffs in the present case proffer direct evidence of a deliberate pattern or practice of age discrimination, coupled with evidence that IDS was aware of the potential for class claims as a result of a survey that it conducted in response to Glass's charge. As a result, IDS's claims of lack of notice are not as compelling as those in *Ulvin. See, e.g., EEOC v. Home Ins. Co.,* 553 F.Supp. 704, 712–13 (S.D.N.Y.1982) (concerns about prejudice to defendants because of lack of notice diminish or disappear when evidence of a continuing violation exists).

The situation in *Ulvin* also differs because the EEOC was not a party to that action. The EEOC, unlike private litigants, is authorized to seek direct relief without regard to any plaintiff's charge filing. *Gilmer v. Interstate/Johnson Lane Corp.,* — U.S. ——, 111 S.Ct. 1647, 1653, 114 L.Ed.2d 26 (1991); *see also infra.* The EEOC also gave IDS actual notice of the claims that it would litigate if it filed suit and provided IDS with an actual opportunity to conciliate all of the class members' claims. IDS nonetheless rejected all of the EEOC's conciliation overtures. In *Ulvin,* however, there was no indication that the employer ever rejected any conciliation offers or had any notice of the early retirees' claims. The court thus finds that the

---

17. The court is unable to examine the actual study because the distribution data is missing; IDS has produced only this memo, which apparently accompanied the study.

EEOC's participation distinguishes the present case.

Finally, *Ulvin* did not present a situation where an agency allegedly failed to properly investigate claims or notify defendants because of a policy that mischaracterized all class claims, and also allegedly failed to amend a charge with information contained in an intake questionnaire. Under similar circumstances, the Ninth Circuit held that plaintiffs' could assert claims not reasonably related to those in the charge because the EEOC failed to adequately investigate those unrelated claims. *Albano*, 912 F.2d at 388. The effects of the ICRC's alleged mishandling are significant in the present case. In its interrogatory answers to this action, IDS gave the following reasons why the individuals who were specifically named in Glass's intake questionnaire were no longer division managers: J.R. Klukas ("voluntarily stepped down"); Gerald Gant ("was stepped down ... to district manager"); Thor Nygren ("voluntarily retired"); and Carl Fazzini ("was stepped down"). Those four discharge mechanisms mirror the discharge methods challenged by plaintiffs in this litigation; thus, the intake questionnaire may have provided sufficient information to allow the ICRC to conciliate those claims and pass such information to IDS by properly characterizing the claims and forwarding the intake questionnaire. Plaintiffs also proffer evidence demonstrating that ICRC employees knew that the Glasses informed them during the intake process of a pattern of age discrimination against similarly situated division managers. *Cf. Church*, 137 F.R.D. at 302 ("the method from which the EEOC receives notice should not serve to defeat a classwide claim of discrimination; rather it should suffice that the EEOC has notice from the charge or notice in fact, however received, so that it can begin the conciliation process"). Thus, the court concludes that the standard set forth in *Ulvin* does not bar the claims of any of the claimants who seek to piggyback on Glass's charge.

IDS also claims that the Glass charge was insufficient because the alleged absence of class allegations deprived IDS of an opportunity to conciliate claims. Although the issue of failure to conciliate is discussed more fully *infra* (see motion concerning the EEOC's alleged failure to conciliate), the court notes that IDS, in response to Glass's charge alone, generated a study that showed a "dramatic shift towards a younger group of division managers" (Svobodny memo), thus suggesting that IDS had actual knowledge of a potential class as early as November 21, 1986. The court further notes that IDS rejected the ICRC's offer to mediate the Glass charge just ten days later. Moreover, as previously discussed, IDS's alleged deprivation of an opportunity to conciliate may flow from the ICRC's actions and policy rather than any purported inadequacies in the Glass charge.

■ IDS finally alleges that Glass believed that he was filing an individual charge, thus his charge cannot support a class action. Some circuits seem to require an intent to represent a class. *See, e.g., Naton v. Bank of California*, 649 F.2d 691, 697 (9th Cir.1981) (because claimant's notices expressed no intention to sue on behalf of anyone other than himself, "the district court properly dismissed the claims of the 'opt-ins.' "). Citing Eighth Circuit precedent, the Seventh Circuit explicitly rejected this requirement:

> [w]e understand that each of these cases expresses the notification requirement somewhat differently and that some can be read as requiring that the charge expressly state that the complainant intends to represent himself and others similarly situated. However, we do not believe that such an explicit mention that a representative action is contemplated is necessary. Like the *Kloos* court, we believe that '[t]o be faithful to the purposes of the filing requirement, an administrative charge must allege class-wide discrimination or claim to represent a class in order to serve as the basis for an ADEA class action....'

*Anderson v. Montgomery Ward & Co.*, 852 F.2d 1008, 1017 (7th Cir.1988) (quoting *Kloos*, 799 F.2d at 400). The court thus rejects IDS's contention. Under Eighth Circuit law, Glass's charge is sufficient if it

provided the ICRC with "fair notice" of the existence of class claims, *see Kloos*, 799 F.2d at 401 n. 5; it is not a requirement that Glass also intended to represent a class.[18]

Based on the foregoing, the court finds that material fact disputes exist concerning the sufficiency of the Glass charge based on the undisputed allegations made by Mrs. Glass and the contents of the intake questionnaire, and thus denies IDS's motion for partial summary judgment.

### 3. *Defendants' Motion for Summary Judgment on Equitable Tolling*

Plaintiffs urge the court to equitably toll the ADEA statute of limitations because IDS allegedly failed to post notices informing employees of their rights under the ADEA, in violation of 29 U.S.C. § 627.[19] Plaintiffs also contend that IDS lulled several plaintiffs into sleeping on their rights by offering those plaintiffs alternative employment.[20] Plaintiffs further claim that IDS deliberately concealed an illegal pattern or practice of age discrimination, thereby misleading various plaintiffs.[21] Plaintiffs argue that IDS is equitably estopped from asserting a statute of limitations defense against any plaintiffs who have been misled in that fashion. IDS moves for summary judgment on the issue of equitable tolling.[22]

The ADEA's charge-filing requirement is not a jurisdictional prerequisite to suit and may be excused in certain circumstances. *See, e.g., DeBrunner v. Midway Equip. Co.*, 803 F.2d 950, 952 (8th Cir.1986) (citations omitted). Plaintiffs who have failed to file a timely charge have the burden of establishing the facts necessary to justify equitable tolling. *See, e.g., Byers v. Follmer Trucking Co.*, 763 F.2d 599, 600–01 (3d Cir.1985). An employer's failure to post notice of employees' ADEA rights may provide grounds for equitable tolling; plaintiffs, however, are not entitled to such tolling if they are generally aware of their rights not to be discriminated against on the basis of age or if they have the means of obtaining such information. *DeBrunner*, 803 F.2d at 952. Plaintiffs need not be aware of specific provisions of the law, such as the length of relevant filing periods; general knowledge of their rights is sufficient to preclude equitable tolling. *Id.*[23]

Equitable tolling is generally not available to plaintiffs who have supervisory responsibility for EEOC compliance or other personnel matters because such plaintiffs are "ideally placed" to obtain general knowledge about their rights. *See Pruet Prod. Co. v. Ayles*, 784 F.2d 1275, 1280 (5th Cir.1986) (permitting no tolling when employee had the means to learn of

---

**18.** The court also rejects that portion of its second order dated June 22, 1990, which suggests that Glass's intent to file only an individual claim precluded a finding that his charge provided sufficient notice of the existence of class claims.

**19.** Section 8 of the ADEA provides that:
Every employer, employment agency, and labor organization shall post and keep posted in conspicuous places upon its premises a notice to be prepared or approved by the Equal Employment Opportunity Commission setting forth information as the Commission deems appropriate to effectuate the purposes of this chapter.
29 U.S.C. § 627 (1988).

**20.** Plaintiffs assert that the following plaintiffs were lulled into sleeping on their rights: Roosevelt Bass, Vincent Enright, Gerald Gant, Maurice Harrington, C. Donald Ladd, Gerald Learned, Thomas LoMacchio, E.H. Poole, E.B. Sheppard and Robert Wilber.

**21.** Plaintiffs argue that IDS concealed a pattern or practice of age discrimination and thus is estopped from asserting a statute of limitations defense against six plaintiffs: J. Grant Trauth, C. Donald Ladd, Rosevelt Bass, Kurt Vezner, Maurice Harrington and Thomas LoMacchio.

**22.** A total of twenty plaintiffs are subject to this motion: Rosevelt Bass, Richard Dean, Vincent Enright, John Evans, Gerald Gant, Maurice Harrington, Junior Klukas, C. Donald Ladd, Gerald Learned, Thomas LoMacchio, John Lose, Robert Novak, E.H. Poole, E.B. Sheppard, J. Thomas Sinyard, J. Grant Trauth, C. Thomas Turner, Kurt Vezner, William Walters and Robert Wilber.

**23.** If notice is not posted, the employer bears the burden of proving that employees possessed general knowledge of their ADEA rights. *DeBrunner*, 803 F.2d at 952.

the existence of his rights as a result of his personnel duties). The court determines that plaintiffs in the present case are not entitled to invoke the equitable tolling doctrine based on IDS's alleged failure to post ADEA notices. First, all of the plaintiffs subject to this motion are well educated. In order to work in the financial services industry they had to be licensed to sell insurance and securities, and as divisional managers, they were also responsible for compliance with all NASD and SEC regulations. Second, all of the plaintiffs were senior managers in a complex industry, responsible for hiring, firing and promoting planners, district managers and clerical staff. Third, almost all of the plaintiffs have either admitted that they were responsible for insuring compliance with state and federal employment discrimination laws or have admitted that they knew that age discrimination is illegal.[24] The court finds that by virtue of their education, training and experience as personnel managers, all twenty plaintiffs subject to this motion possessed a general awareness of their ADEA rights or had the means to obtain such knowledge and thus are not entitled to invoke equitable tolling on the basis of IDS's alleged failure to post ADEA notices. *Nielsen v. Western Elec. Co., Inc.*, 603 F.2d 741, 744 (8th Cir.1979) (no tolling because plaintiff was well educated, had supervisory position, had attended educational seminars, meetings and lectures and was generally familiar with the ADEA); *Fressell v. AT & T Technologies, Inc.*, 35 Fair Empl.Prac.Cas. (BNA) 658, 660, 1984 WL 1002 (N.D.Ga.1984) (supervisory personnel who were required to be acquainted with ADEA not entitled to tolling for failure to post).

 Plaintiffs also contend that IDS is estopped from asserting a statute of limitations defense because it concealed a

pattern and practice of age discrimination from various plaintiffs. When determining whether the statute of limitations should be tolled as a result of an employer's acts of concealment, the Eighth Circuit has held that:

> [w]hether or not an employer tells its employees the true reason for the adverse employment decision is not the standard. Nor is it especially relevant that, as the facts show, [the employer] has attempted to conceal its discriminatory actions.

*Heideman v. PFL, Inc.*, 904 F.2d 1262, 1266 (8th Cir.1990). Rather, the proper inquiry is whether an employer successfully misled plaintiffs regarding the nature of their ADEA rights or prevented them from discovering or pursuing those rights. *Id.* Plaintiffs present no evidence of such misconduct by IDS. Plaintiffs also had general knowledge of their ADEA rights through information provided to them by IDS and through their personnel activities with IDS. Accordingly, the court rejects plaintiffs' claim that IDS is equitably estopped from asserting a statute of limitations defense on the basis of concealment.

 The court further rejects plaintiffs' contention that IDS is equitably estopped from asserting a statute of limitations defense because its promises of future employment lulled ten plaintiffs into sleeping on their rights. In such cases:

> [t]he statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the consequence of either a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.

---

**24.** Only four of the plaintiffs subject to this motion, Vincent Enright, Gerald Learned, William Walters and Kurt Vezner, claim that they did not know that age discrimination was illegal during the time that they were division managers. Despite their testimony that they did not know that age discrimination was illegal, those four plaintiffs all admitted that they had access to information about their ADEA rights as a

result of home office sales bulletins, G bulletins, the marketing manager's EEOC handbook or the division office policy and procedure manual. The court thus determines that these four plaintiffs had the means to obtain information concerning their ADEA rights, and thus are not entitled to equitable tolling based on IDS's alleged failure to post notices.

*Kriegesmann v. Barry–Wehmiller Co.,* 739 F.2d 357, 358–59 (8th Cir.1984) (citing *Price v. Litton Business Sys., Inc.,* 694 F.2d 963, 965 (4th Cir.1982)). In *Kriegesmann,* the Eighth Circuit determined that an employer's actions to mitigate the harshness of a discharge will not justify equitable estoppel in the absence of an intent to cause an employee to delay his filing of a charge. *Id.* Even assuming plaintiffs' allegations are true, plaintiffs provide no evidence of IDS's intent to delay their timely filing of charges. Thus, IDS's offers of alternative employment are insufficient to justify equitable tolling. Based on the foregoing, the court grants IDS's motion for summary judgment on the issue of equitable tolling.

4. *Defendants' Motion to Dismiss EEOC's Complaint In Intervention or to Limit EEOC's Participation*

On April 16, 1990, following a seven-month investigation of plaintiffs' age discrimination allegations, the EEOC filed a complaint and motion to intervene in the present action. Magistrate Judge Floyd E. Boline granted that motion in an order dated May 2, 1990.[25] IDS moves to dismiss the EEOC's complaint in intervention, contending that the EEOC failed to fulfill its statutory duty to conciliate. In the alternative, IDS seeks a ruling that the EEOC may not, by its intervention, revive any of plaintiffs' claims that would otherwise be untimely.

A. The EEOC's Alleged Failure to Conciliate

IDS argues that the EEOC has two separate duties to conciliate: one that arises after a charge is filed and a separate duty to conciliate before a lawsuit is filed. It is undisputed that IDS waived any defense concerning the adequacy of the EEOC's conciliation efforts conducted after January 1, 1990.[26] IDS nonetheless urges the court to dismiss the EEOC's complaint in intervention because the EEOC allegedly failed to conciliate during the period of time after plaintiff Milo Glass filed his charge in 1986.[27]

■■■■ The ADEA has two conciliation provisions. Section 626(b), which applies to direct actions brought by the EEOC, provides in pertinent part that:

> [b]efore instituting any action under this section, the Equal Employment Opportunity Commission shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

29 U.S.C. § 626(b) (1988). Section 626(d), which applies to civil actions brought by individuals, requires that an individual file a charge with the EEOC and that:

> [u]pon receiving a charge, the Commission shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference and persuasion.

29 U.S.C. § 626(d) (1988). The ADEA, however, does not define the EEOC's duty to conciliate in those actions in which it

---

**25.** The order further stated that:
EEOC shall not, through its intervenor's complaint, expand the scope of individual relief sought beyond the 32 existing plaintiffs.
*Glass v. IDS Financial Servs., Inc.,* No. 4–89–76 (D.Minn. May 2, 1990) (magistrate judge's order permitting EEOC intervention).

**26.** In a letter to the EEOC dated March 20, 1990, counsel for IDS acknowledged that IDS:
agree[d] to waive its defense to possible Commission intervention based on the absence of any effort to conciliate at any time following January 1, 1990.
Letter from Roy A. Ginsburg to Lloyd B. Zimmerman. IDS also waived both conciliation

and a cause decision prior to filing pursuant to 29 U.S.C. § 626(b) (1988). *Id.*

**27.** As previously discussed, IDS declined the ICRC's offer to conciliate Glass's charge ten days after an IDS employee circulated an age distribution study that apparently showed a "dramatic shift" towards younger division managers. The court also notes that Mrs. Glass's undisputed reference to the demotion and replacement of division managers in four other offices combined with the allegations in Glass's intake questionnaire may have been sufficient to provide the ICRC with the opportunity to conciliate the class claims. *See Ulvin,* 943 F.2d at 865.

intervenes [28] and IDS offers no cases to support the proposition that the sufficiency of the EEOC's conciliation efforts should be evaluated by focusing solely on its activities during the period of time after a charge is filed.[29] Moreover, the Eighth Circuit allowed the EEOC to intervene in a Title VII action even though it had made no efforts to conciliate prior to its intervention. The Court held that:

> the EEOC cannot be precluded from intervention because it failed to conciliate.
>
> . . . .
>
> Because we believe strongly in the value of conciliation, we hold that while the EEOC is not barred from intervention by its failure to attempt to conciliate, it is under a continuing obligation to attempt to conciliate even after it has intervened in the action.

*Johnson v. Nekoosa–Edwards Paper Co.,* 558 F.2d 841, 847–48 (8th Cir.1977).[30] The Eighth Circuit also permitted the EEOC's suit in intervention to broaden the issues beyond those raised by the individual's charge because the "EEOC is not so restricted if it brings a direct suit." *Id.* at 846–47. IDS nonetheless attempts to distinguish *Nekoosa–Edwards* because it arises under Title VII rather than the ADEA.[31] The conciliation language of Title VII, however, is virtually identical to that of the ADEA.[32] *See Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (stating that the substantive ADEA provisions "were derived *in haec verba* from Title VII"); *cf. Vance v. Whirlpool Corp.,* 716 F.2d 1010, 1012 (4th Cir.1983) (judicial interpretation of Title VII provision provides "significant interpretive authority of . . . like provision[s] of the ADEA", citing *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1978)). In light of the similar goals and conciliation provisions of the statutes, the court finds no reason to adopt a different standard for the EEOC's conciliation duties after its intervention in an ADEA case. *See, e.g., Bauman v. Suchard, Inc.,* 52 Fair Empl.Prac.Cas. (BNA) 1013, 1990 WL 37659 (N.D.Ill. March 21, 1990) (applying *Nekoosa–Edwards* to an ADEA class action and permit-

**28.** If the conciliation requirements for direct suits also apply to actions in which the EEOC intervenes, then the EEOC's duty arises under Section 626(b). *See, e.g., EEOC v. Sperry Univac Corp.,* 36 Empl.Prac. Dec. (CCH) ¶ 35,019, 1982 WL 649 (D.Utah 1982) (before the EEOC brings a direct action, it must comply with the conciliation provisions of § 626(b)); *see also Gilmer v. Interstate/Johnson Lane Corp.,* —— U.S. ——, 111 S.Ct. 1647, 1653, 114 L.Ed.2d 26 (1991) (stating that "[b]efore the EEOC can bring such [a direct] action . . . it must 'attempt . . . conciliation,'" and citing § 626(b)).

**29.** The cases on which IDS relies, with one exception, arise under Section 626(b) and thus address the EEOC's failure to conciliate prior to bringing a direct suit. *See, e.g., Brennan v. Ace Hardware,* 495 F.2d 368, 374 (8th Cir.1974) (holding that the EEOC must comply with the conciliation requirements under 29 U.S.C. § 626(b) before it files suit); *Marshall v. Sun Oil,* 605 F.2d 1331 (5th Cir.1979) (same). IDS provides no authority for the proposition that an EEOC suit may be dismissed for inadequate conciliation efforts after a charge is filed rather that during the period before a suit is filed. IDS's contention that the EEOC has two separate duties to conciliate is further undermined by the EEOC's power to file a direct suit under the ADEA without any charge at all. *See, e.g.,*

*Gilmer,* 111 S.Ct. at 1653 ("the EEOC's role in combating age discrimination is not dependent on the filing of a charge; the agency may receive information concerning alleged violations of the ADEA 'from any source,' and it has independent authority to investigate age discrimination", citing 29 C.F.R. §§ 1626.4 & 1626.13 (1990)).

**30.** One year later, the Eighth Circuit again permitted the EEOC to intervene in a Title VII class action before conciliation and before completion of the administrative process. *United States Fidelity & Guar. Co. v. Lord,* 585 F.2d 860, 866 (8th Cir.1978).

**31.** Other courts have also allowed the EEOC to intervene in a Title VII action before it attempted to conciliate. *See Nekoosa–Edwards,* 558 F.2d at 847 & n. 13 (citing cases).

**32.** Title VII provides that after a charge has been filed:
> [i]f the Commission determines after [an] investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.
42 U.S.C. § 2000e–5(b) (1988).

ting the EEOC to intervene notwithstanding its failure to conciliate).

■ The adequacy of the EEOC's conciliation efforts must also be evaluated in light of IDS's response to those efforts, specifically IDS's repeated assertions that EEOC charge processing would be pointless and its rebuff of every EEOC conciliation overture. *Cf. Marshall v. Sun Oil Co.*, 605 F.2d 1331, 1334–35 (5th Cir.1979) (holding that adequacy of the EEOC's conciliation efforts must be measured in light of the employer's response). Based on IDS's waiver and its repeated refusals to conciliate, the court finds that the EEOC's conciliation efforts prior to its intervention were sufficient to satisfy any statutory duty that it may have. The court thus rejects IDS' claim that the EEOC's complaint should be dismissed for its failure to conciliate, denies IDS' motion to dismiss the EEOC's complaint in intervention and grants summary judgment in favor of the EEOC on this issue.

## B. Limiting the EEOC's Participation

In the alternative, IDS seeks a ruling to prevent the EEOC from reviving any age discrimination claims that IDS argues would otherwise be untimely.[33] Individuals must file timely administrative charges prior to bringing suit under the ADEA. IDS argues that the EEOC should also be subject to the same requirement because it merely intervened in the present case rather than pursuing its own direct action.[34] Advancing an argument which has never been accepted by a federal court, IDS contends that the EEOC's power in the present action rests on 29 U.S.C. § 626(d), which requires the filing of a timely charge, rather than on 29 U.S.C. §§ 216(c) or 217, which include no such requirement. IDS thus argues that the EEOC does not have the power to assert claims on behalf of any individual who has not filed a timely charge. Section 626(d), however, expressly refers to the charge-filing requirements for individuals seeking to bring ADEA actions,

**33.** On April 16, 1990, when the EEOC filed its motion to intervene, it stipulated that it "shall not, through its intervention complaint, expand the scope of individual relief sought beyond the 32 existing plaintiffs." IDS contends that as a corollary to this stipulation, the EEOC also "agreed to take this case as it found it" and thus may not, by its intervention, revive otherwise untimely claims because to do so would expand the scope of the lawsuit. The stipulation, however, did not diminish the EEOC's authority to seek individual relief for the named plaintiffs, but merely limited membership in the class to those thirty-two plaintiffs who had joined the lawsuit as of the date of its intervention. Thus, the court rejects IDS's contention that the EEOC, as a result of its stipulation, may not assert the allegedly untimely claims of various plaintiffs.

**34.** Although no court has addressed the impact of the charge-filing requirement when the EEOC intervenes in a private action, courts have held that the EEOC, in other circumstances, is not bound by the procedural requirements imposed on private individuals. In 1980, the Supreme Court held that the EEOC, in a Title VII direct action, is not required to comply with the procedures for bringing a class action pursuant to Federal Rule of Civil Procedure 23. *General Telephone Co. v. EEOC*, 446 U.S. 318, 329, 100 S.Ct. 1698, 1705, 64 L.Ed.2d 319 (1980). The Fifth Circuit extended the *General Telephone* holding to Title VII actions in which the EEOC

intervened. *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 682–83 (5th Cir.1985). The Fifth Circuit based this extension on the Supreme Court's rationale that the EEOC, in addition to acting on behalf of specific individuals, also acts to "vindicate the public interest in preventing employment discrimination" when bringing or intervening in enforcement actions. *Id.* at 682 (citing *General Telephone*, 446 U.S. at 326, 100 S.Ct. at 1704). The Tenth Circuit, relying on the same rationale, also determined that the EEOC's authority to represent a class is indistinguishable in a direct suit or an intervention pursuant to Title VII. *United Telecommunications, Inc. v. Saffels*, 741 F.2d 312, 314 (10th Cir.1984). The EEOC, as an intervenor, also has an independent jurisdictional basis to maintain class actions pursuant to Title VII, even after private claims have been decertified. *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 682–83 (5th Cir.1985) (relying on *Nekoosa–Edwards*).

Although these cases arise under Title VII, courts have also held that the EEOC is not bound to follow procedures required of individuals in direct suits pursuant to both the Fair Labor Standards Act ("FLSA") and the ADEA. *See, e.g., Donovan v. University of Texas at El Paso*, 643 F.2d 1201, 1204 (5th Cir.1981) (applying *General Telephone* to FLSA action); *EEOC v. Gilbarco, Inc.*, 615 F.2d 985, 988–90 (4th Cir. 1980) (unlike individual ADEA claimants, EEOC is not required to file a complaint which names all aggrieved individuals); *Marshall v. Chamberlain Mfg. Corp.*, 601 F.2d 100, 101 (3d Cir.1979)

making no reference to the scope of the EEOC's enforcement powers.[35] Moreover, all of the cases on this point reject IDS's position and hold that timeliness for purposes of direct litigation by the EEOC is controlled by the two or three-year statute of limitations found in 29 U.S.C. § 255, and not the time period for filing charges pursuant to 29 U.S.C. § 626(d). *See, e.g., Gilmer*, 111 S.Ct. at 1653; *Marshall v. Chamberlain Mfg. Corp.*, 601 F.2d 100, 101 (3d Cir.1979) (EEOC is not required to follow charge-filing procedures of 29 U.S.C. § 626(d)(2)).

IDS further argues that "it defies common sense to hold that an individual may recover under the ADEA when his claim is time barred by the simple convenience of having the EEOC bring a claim on his behalf." Such power, however, is consistent with the statutory language of the ADEA. As one court noted:

> Nothing in the express language of the ADEA or the incorporated provisions of the FLSA conditions EEOC enforcement actions upon the timely filing of private charges of discrimination under § 626(d).... The requirement that individuals file charges of discrimination is not intended as the triggering mechanism of EEOC's enforcement authority....
>
> ....
>
> Unless the agency commences its action beyond the 2–year/3–year period specified by § 255(a) as adopted by § 626(e), the cause of action, even on behalf of a single individual, cannot be said to be time-barred.

*EEOC v. Sperry–Univac Corp.*, 36 Empl. Prac.Dec. (CCH) ¶ 35,019, 1982 WL 649 (EEOC is not required to follow procedures for individuals set forth in 29 U.S.C. § 626(d)(2)).

35. The ADEA provides that:
> No civil action may be commenced by an *individual* under this section until 60 days after a charge alleging unlawful discriminations has been filed with the Equal Employment Opportunity Commission.

29 U.S.C. § 626(d) (1988) (emphasis added). Section 626(b), however, specifically refers to actions instituted by the EEOC, and provides that:
> The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections

(D.Utah 1982). Thus, the EEOC's ability to assert a direct action is not predicated on the filing of a timely charge, *see, e.g., Gilmer*, 111 S.Ct. at 1653 ("the EEOC's role in combating age discrimination is not dependent on the filing of a charge"), rather it may assert claims for which no timely charge is filed as long as those claims fall within either the two-year or three-year statute of limitations period provided by the incorporation provision of 29 U.S.C. § 626(e)(1).[36] *See, e.g., Marshall*, 601 F.2d at 105; *Reich v. Dow Badische Co.*, 575 F.2d 363, 368 (2d Cir.1978).

IDS asks the court to not extend this rule to present case, arguing that the EEOC must stand in the shoes of an individual claimant when it intervenes in an ongoing ADEA class action. The court finds no reason, however, to adopt a different rule solely because the EEOC intervened in the present case rather than bringing its own direct action. The court thus determines that the EEOC's ability to assert claims after intervening is limited only by the two or three-year limitation period set forth in 29 U.S.C. § 255(a), as adopted by 29 U.S.C. § 626(e), not the charge-filing period, and denies IDS's motion to limit the EEOC's ability to assert any allegedly untimely claims if such claims fall are timely pursuant to Section 255(a).

5. *Defendants' Motion for Summary Judgment on the ADEA Claims of Plaintiffs Chapdelaine, Silver and Treaster*

IDS moves for summary judgment on the age discrimination claims of three plain-

211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection [626] (c).
29 U.S.C. § 626(b) (1988). None of the sections to which Section 626(b) refers require a charge to be filed prior to any EEOC action.

36. The ADEA provides that for statute of limitations purposes:
> Sections 255 and 259 of this title shall apply to actions under this chapter.

29 U.S.C. § 626(e)(1) (1988). Section 255 provides a two-year statute of limitations unless a cause of action is premised on a willful violation, in which case the statute of limitations is extended to three years.

tiffs, Edward Chapdelaine ("Chapdelaine"), Phillip Silver ("Silver") and Carolyn Treaster ("Treaster"). IDS contends that those claims are untimely because the plaintiffs did not file suit within three years of receiving notice of their terminations. IDS characterizes that notice as the relevant adverse employment decision for purposes of the statute of limitations. IDS further contends that Treaster's age discrimination claim is untimely because she was discharged more than 300 days before Glass filed his charge. IDS argues that because Treaster was unable to file a timely individual charge at the time that Glass submitted his charge, her age discrimination claim is also barred on this basis.

Plaintiffs concede that IDS notified plaintiffs Treaster, Chapdelaine and Silver of their initial demotions outside of the limitations period. Plaintiffs contend, however, that IDS maintained a pattern or practice of age discrimination and that their claims are timely because IDS, within the relevant limitations period, committed other discriminatory acts against those plaintiffs in furtherance of its allegedly illegal pattern or practice.[37]

> To establish a continuing violation [a plaintiff] would have to show 'a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period.'

*Valentino v. United States Postal Serv.,* 674 F.2d 56, 65 (D.C.Cir.1982) (quoting Barbara Lindemann Schlei & Paul Grossman, *Employment Discrimination Law* 232 (Supp.1979)) (Title VII case).[38] A continu-

ing violation "can either be a company-wide policy of discrimination or a series of related acts taken against a single individual." *Bruno v. Western Elec. Co.,* 829 F.2d 957, 961–62 (10th Cir.1987) (ADEA case). Moreover, a formal, written policy is not required to establish such a pattern or practice. Courts have determined that an informal or unstructured method of decision making may be sufficient to invoke this doctrine. *See, e.g., Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 760–61 (9th Cir. 1980) (plaintiff's allegations of discrete, specific acts may be construed as evidence of a policy of discrimination that pervaded defendant's personnel decisions).

> Under the continuing violation theory, a plaintiff who shows a continuing policy and practice that operated within the statutory period has satisfied the filing requirements. When the policy and practice is company-wide, the plaintiff can show that a violation occurred within the statutory period by showing some application of the policy within that period. On the other hand, if the defendant can show that the policy was discontinued before the limitations period, then, as a matter of law, plaintiff's claim must be dismissed.

*Bruno,* 829 F.2d at 960–61 (citations omitted) (ADEA case).[39] Courts have applied the theory to toll both the charge-filing period for individuals contained in 29 U.S.C. § 626(d), *see, e.g., id.,* and also the statute of limitations contained in 29 U.S.C. §§ 255 & 259 (as incorporated by § 626(e)). *See, e.g., Blumenthal v. G–K–G Inc.,* 737 F.Supp. 493, 496–97 (N.D.Ill.1990) (where plaintiff alleges continuing violations,

---

**37.** Plaintiffs also contend that they are entitled to equitable tolling. The court rejects this contention for the reasons set forth in the discussion *supra.*

**38.** The court relied on both ADEA and Title VII cases throughout this section because, as the Tenth Circuit stated:
> [the] filing requirements and the application of the continuing violation theory are the same for ADEA and Title VII cases....

*Bruno,* 829 F.2d at 960 n. 1.

**39.** Despite numerous cases invoking the continuing violation doctrine, "the precise contours and theoretical basis of [the theory] are at best

unclear." *Berry v. Board of Supervisors,* 715 F.2d 971, 979 (5th Cir.1983) (footnote omitted) (Title VII claim). Moreover, cases applying this doctrine have been described as "inconsistent and confusing." *Scarlett v. Seaboard Coast Line R.R. Co.,* 676 F.2d 1043, 1049 (5th Cir.1982) (citation omitted); *see generally,* Thorton H. Brooks, M. Daniel McGinn & William P.H. Cary, *Second Generation Problems Facing Employers in Employment Discrimination Cases: Continuing Violations, Pendent State Claims, and Double Attorneys' Fees,* 49 Law & Contemp.Probs. 25 (1986) (discussing theory).

claims will survive a "motion to dismiss if a discriminatory act occurred during the limitations period"); *EEOC v. Home Ins. Co.,* 553 F.Supp. 704, 712–13 (S.D.N.Y.1982) (applying the theory to suspend the ADEA two or three-year statute of limitations). Thus, an ADEA claim:

> may be based on a continuing policy and practice of discrimination that began before the statutory filing period, as long as the employer continues to apply the discriminatory policy and practice to a point within the relevant filing period.... There must be at least one instance of the discriminatory practice within the filing period for the continuing violation theory to apply.

*Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1543 (10th Cir.1987).

■■■ IDS nonetheless argues that the court should not apply the continuing violation doctrine in the present case because that doctrine is not applicable to "discharge actions." The court, however, rejects IDS's attempt to narrow plaintiffs' action, finding that plaintiffs allege a series of related acts, in addition to discharges, that may comprise an illegal pattern or practice of age discrimination.[40] The court therefore finds the cases on which IDS relies distinguishable because they all involve sit-

uations that are more appropriately characterized as discharge actions.

■■■ IDS also contends that the Eighth Circuit has not adopted the continuing violation doctrine in ADEA actions. The Eighth Circuit applied the doctrine, however, in an ADEA action in which plaintiffs filed EEOC charges more than fifteen years after they allegedly became aware of an ongoing discriminatory practice. *International Bhd. of Elec. Workers Local 1439 v. Union Elec. Co.,* 761 F.2d 1257, 1258 n. 1 (8th Cir.1985). The Eighth Circuit held that in cases where plaintiffs can prove such a practice:

> the relevant law for calculating the time period [for filing an age discrimination charge] is the termination of the allegedly unlawful practice. Because the Company is still maintaining the challenged age bar, the alleged violation is continuing and the [plaintiffs'] charges were timely filed.

*Id.* Although the Eighth Circuit applied the continuing violation theory to determine the relevant period for filing a charge under 29 U.S.C. § 626(d), the Court explicitly relied on *EEOC v. Home Ins. Co.,* 553 F.Supp. 704 (S.D.N.Y.1982), which applied the theory to toll the ADEA two or three-year statute of limitations.[41] Thus, two

---

**40.** As noted in one treatise, in cases like the present one where no formal, structured system of discrimination exists:

> Plaintiffs normally allege that illegal acts of discrimination against them are part of a system; defendants normally contend that if discrimination occurred, the acts of discrimination were sporadic and unrelated.

Barbara Lindemann Schlei & Paul Grossman, *Employment Discrimination Law* 1050 (2d ed. 1976) (footnote omitted).

> The plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy.... In such cases, the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts.

*Stewart v. CPC Int'l Inc.,* 679 F.2d 117, 121 (7th Cir.1982) (citing *Elliott v. Sperry Rand Corp.,* 79 F.R.D. 580 (D.Minn.1978), and discussing four situations in which continuing violation theory has been applied).

**41.** The court in *Home Insurance Co.* stated that:

> where a continuing violation can be alleged ... concerns as to a defendant's prejudice are

absent or diminished: an employer maintaining a company-wide unlawful employment practice is in a less sympathetic position when seeking repose; more significantly, the continued nature of the policy represents its "affirmative perpetuation", and is susceptible to characterization as a conscious waiver of limitations period protection.... Moreover, since the employer remains subject to suit by a current employee or by the EEOC, the concern respecting production of evidence as to past acts is considerably diminished. Simply put, an employer that maintains a continuing violation neither deserves nor obtains repose.

553 F.Supp. at 713 (citations omitted); *see also Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 614–15 (10th Cir.1988) (holding that "[w]here plaintiffs challenged not just one incident or isolated incidents of conduct violative of the ADEA, but an unlawful practice involving several incidents, a charge filed with the EEOC is timely when it is filed within 180 [or 300] days of the termination of the policy and practice adversely affecting the plaintiffs"); *Blumenthal,* 737 F.Supp. at 496–97 (permitting theory of con-

other questions must be resolved before the timeliness of plaintiffs' claims may be determined: did IDS engage in a pattern or practice of age discrimination, and if so, when did the pattern or practice end? Depending on the answers to those two questions, plaintiffs may also be able to piggyback on Stephen's charge. *See also supra.*

In another ADEA action, the Fourth Circuit applied the continuing violation doctrine to a situation very similar to the pattern and practice of discrimination alleged by plaintiffs. *Taylor v. Home Ins. Co.,* 777 F.2d 849 (4th Cir.1985). Taylor managed a regional office of the defendant insurance company for nine years. Despite evidence that he was a capable and successful manager, the insurance company gave Taylor the choice, at age fifty-three, of either resigning, accepting a demotion and transfer to another city in the position of underwriting manager, or seeking work in another regional office. Taylor became an underwriting manager, but the company substantially curtailed his authority and duties after he had held that position for a few months. *Id.* at 851–52. After two years, the company again transferred Taylor to fill what the company characterized as a newly created position, which turned out to be a sales position. Taylor alleged that the company essentially set him up to fail by imposing unreasonable sales quotas. *Id.* at 852–53. The Fourth Circuit allowed Taylor to include the earlier demotion in his ADEA claim despite the fact that it oc-

curred more than 180 days before Taylor filed his EEOC complaint. The Fourth Circuit concluded that the earlier demotion was part of an unlawful practice that continued into the relevant charging period. *Id.* at 856. Taylor was thus allowed to bring claims based on both demotions.

 Plaintiffs in the present case allege a similar pattern of discrimination. After their initial demotions from the position of division manager, Treaster, Chapdelaine and Silver continued with IDS as either district managers, planners or consultants. Plaintiffs contend that IDS continued to discriminate against them by further demoting Treaster and Silver within the limitations period, and ultimately terminated all three plaintiffs within the limitations period. Plaintiffs argue that those acts are evidence of a continuing policy of discrimination against older division managers. Plaintiffs thus allege discriminatory acts, taken by IDS against Treaster, Chapdelaine and Silver within the relevant limitations period, which comprise part of the ongoing pattern or practice of discrimination.[42] The court finds that these allegations are sufficient to raise a material fact dispute regarding the existence of a pattern or practice of age discrimination.[43] The court further finds that if such a pattern or practice existed, plaintiffs proffer evidence that it continued into the relevant statute of limitations period, thus plain-

---

tinuing violations to toll both charge-filing period and statute of limitations).

The *Home Insurance* court also held that:

where an employer maintains a discriminatory mandatory retirement provision, the timeliness of a claim asserting unlawful termination thereunder should be determined with reference to the earlier of either the last day of employment, or if applicable, the date on which the employer eliminates the unlawful provision.

*Id.* The *Home Insurance* court thus determined that the relevant date for each employee for purposes of the statute of limitations was the date of that employee's termination. *Id.* The present case, however, is distinguishable because plaintiffs assert a policy or practice of discrimination which encompasses more than mere termination. *Cf. Taylor,* 777 F.2d at 856–57.

**42.** In addition to tolling the ADEA time limitations:

[d]iscriminatory acts occurring before the filing periods are relevant evidence of the continuing unlawful practice and [the company's] discriminatory intent, and are used by the courts to fashion a remedy and determine damages.

*Furr,* 824 F.2d at 1543 (citations omitted).

**43.** Moreover, in a class action, proof of a pattern or practice of discrimination shifts to the defendant the burden of showing that individual members of the class were not victims of discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 359–62, 97 S.Ct. 1843, 1866–68, 52 L.Ed.2d 396 (1977) (discussing burden of proof in Title VII actions). Various circuits have adopted this analysis for ADEA claims. *See, e.g., Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 n. 17 (1st Cir.1979).

tiffs' claims are not untimely. Following the same analysis, the court determines that Treaster's age discrimination claim may also be timely even though her initial demotion was more than 300 days before Glass filed his charge. *See International Bhd. of Elec. Workers Local 1439*, 761 F.2d at 1258 n. 1 (relevant point in time for calculating the charge-filing period is the termination of the discriminatory pattern or practice). Accordingly, the court denies defendants' motion for summary judgment on the age discrimination claims of plaintiffs Chapdelaine, Silver and Treaster.[44]

### 6. Defendants' Motion for Summary Judgment on Various Plaintiffs' Claims of Constructive Discharge

[22] IDS seeks summary judgment on the claims of eleven plaintiffs, contending that those plaintiffs were never actually discharged, but instead either resigned or retired.[45] IDS contends that those plaintiffs must rely on the legal fiction of constructive discharge to prove that IDS took an adverse employment action as required by the ADEA. IDS argues that because the eleven plaintiffs are unable to meet the requirements of that doctrine their claims must fail.

The court first rejects IDS's claim that those plaintiffs must prove constructive discharge in order to prove the requisite adverse action. Courts have recognized that a wide variety of acts in addition to constructive discharge may constitute adverse employment actions for purposes of the ADEA. *See, e.g., Bruno*, 829 F.2d at 961-62. In *Bruno*, the plaintiff alleged that his employer engaged in a series of related acts as a part of its overall plan to force him into voluntary or involuntary retirement, including the employer's refusal to promote or transfer him, his transfer to a position for which he was not qualified "to build a record that would justify his voluntary dismissal", offers of early retire-

ment, a demotion and decrease in salary, harassment on the basis of his age and various other adverse working conditions. *Id.* at 962-63. The Tenth Circuit held that those acts may constitute a continuing violation of the ADEA if the employer's "intent was to take any action necessary to get rid of plaintiff." *Id.* at 961. Plaintiffs in the present action allege a similar pattern and practice of age discrimination based on a wide variety of employment actions. If proven, the court finds that those acts will be sufficient to satisfy the requirement of adverse action.

■ IDS also contends that once various plaintiffs were demoted, they ceased being employees thereby losing the protection of the ADEA. In light of the evidence regarding a pattern or practice of age discrimination, the court rejects IDS's argument, finding that it would be inequitable to allow IDS to profit by its own allegedly discriminatory acts. The court further notes that the cases on which IDS relies all involve claimants who had never been employees but had always been characterized as either independent contractors or consultants. The instant case is distinguishable because it is undisputed that all the plaintiffs were employees while they held the position of division manager and that the initial acts of discrimination occurred while they were still employees. Any subsequent demotion and loss of employee status was a direct result of IDS's alleged pattern or practice of age discrimination.

The court further rejects IDS's claim that the eleven plaintiffs cannot prove constructive discharge as a matter of law, finding that plaintiffs allege sufficient facts to survive a motion for summary judgment.

> 'A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.'
>
> . . . .

---

**44.** Because the court denied IDS's motion on the basis of the continuing violation theory, it did not reach plaintiffs' argument pursuant to the Age Discrimination Claims Assistance Act of 1988.

**45.** The eleven plaintiffs are: Rosevelt Bass, Edward Chapdelaine, Truman Crabbe, E. John Evans, John Lose, E.H. Poole, Donald Raes, Phillip Silver, Kenneth Solis, William Walters and Robert Wilber.

To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit.... [However,] a constructive discharge arises only when a reasonable person would find conditions intolerable.

*Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981) (quotation and citation omitted). Applying this standard, courts have found the following facts sufficient to survive a motion for summary judgment regarding constructive discharge: an employer demoting an employee, promoting a younger person in his place, and asking the employee about his retirement plans three times in seven months, *see Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 562–63 (1st Cir.1986) (upholding jury verdict for employee); an employer forcing an employee to choose between resignation or a transfer to a lower paying job, *see Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177–78 (10th Cir.1986) (reversing summary judgment for employer); an employer demoting an employee without warning or reprimand, *see Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 49–50 (6th Cir.1985); an employer making several inquiries about retirement plans and demoting an employee to another position, but with same benefits and pay, *see Buckley v. Hospital Corp.*, 758 F.2d 1525, 1530–31 (11th Cir.1985) (reversing directed verdict for employer).

On facts similar to the present case, the First Circuit held that:

> an ADEA plaintiff claiming that he was, in effect, fired by being forced into retirement must show that his employer's "offer" [of early retirement] was but an empty sham masking its decision to fire the plaintiff because of his age.
>
> ....
>
> The question ... thus becomes whether this plaintiff was placed ... in the impossible position of having to choose between discharge and retirement.... The fact that [plaintiff], when confronted with the retire-or-be-fired choice, bargained for all that he could get in the

way of benefits simply does not change the fact that this was, at bottom, a forced retirement, not a voluntary one.

*Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1113 (1st Cir.1989).

 Plaintiffs present significant evidence that IDS had a policy and practice of age discrimination involving a strategy to either terminate or force older division managers to retire, thereby calling into question the alleged voluntariness of any plaintiff's retirement or resignation. IDS urges the court to ignore any pattern or practice evidence and focus on the individual situation of each of the eleven plaintiffs. In ADEA class action lawsuits, however, courts must consider all of the evidence of a pattern and practice of age discrimination to determine whether there are genuine issues of material fact regarding adverse employment decisions. *See, e.g., Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 471–73 (8th Cir.1984) (holding that claims of individual plaintiffs must be considered in light of evidence concerning class claims); *see Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir.1977) (individual employee must be allowed to introduce evidence of pattern or practice of discrimination).

In *Calhoun v. Acme Cleveland Corp.*, the First Circuit explicitly rejected an employer's attempt to get the court to evaluate each discriminatory episode separately. 798 F.2d 559, 562–63 (1st Cir.1986). The First Circuit emphasized that all incidents manifesting discriminatory animus must be evaluated together for purposes of determining whether summary judgment is appropriate:

> Appellants' theory is that since each isolated incident cannot as a matter of law suffice for a constructive discharge, all of them together must also fail to do so. The fallacy in this "divide and conquer" approach is that these events must be viewed as part of a single behavior pattern by appellants.

*Id.* at 562–63.[46] Based on the pattern and practice evidence, the court determines that

---

**46.** Moreover, the Supreme Court has held, in a Title VII class action, that:

material fact disputes exist regarding plaintiffs' allegations of constructive discharge, and thus IDS's motion for summary judgment is denied.

Plaintiffs also argue that there is a material fact dispute regarding whether IDS actually discharged the eleven plaintiffs, following the Eighth Circuit's analysis in *Schneider v. Jax Shack, Inc.*, 794 F.2d 383, 384 (8th Cir.1986). In *Schneider*, the Eighth Circuit acknowledged that a forced demotion may constitute an actual discharge, stating that:

> We do not believe, in identifying a "discharge," lack of a subjective intent to fire [an employee] can outweigh the objective fact that the [employer] was not committed to employing her. The employer should not be able to avoid responsibility for discriminatory discharges by first demoting employees to part-time or fill-in status or by stringing out employees' tenures with nebulous commitments until the employees, for their own well-being, must "quit."

*Schneider*, 794 F.2d at 385. This court applied the analysis of *Schneider* to find an actual discharge in a situation where an employee was offered a "Hobson's choice" of either continuing as a receptionist until she began her maternity leave, at which point she was to be permanently replaced, or of accepting a data entry position which was scheduled to terminate when she completed the limited amount of work. *Gammon v. Precision Eng'g Co.*, 44 Fair Empl. Prac.Cas. (BNA) 1208, 1987 WL 16127 (D.Minn.1987). The court concluded that sophisticated employers should not be allowed to circumvent discrimination laws by clever practices or subtle termination proceedings. *Id.* Based on the foregoing, the court similarly concludes that plaintiffs present sufficient evidence to raise a material fact dispute regarding whether or not they were actually discharged, and that

demonstrating the existence of a discriminatory pattern or practice established a presumption that the individual class members had been discriminated against.

*Cooper v. Federal Reserve Bank*, 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (quotation omitted).

this theory provides an alternative basis for denying IDS's motion for summary judgment.

### 7. IDS's Motion for Summary Judgment on the ADEA Claims of Five Plaintiffs

IDS moves for summary judgment on the ADEA claims of five plaintiffs, contending that it demoted those division managers because of their performance not their age.[47] IDS urges the court to apply the *McDonnell Douglas* burden of proof analysis to evaluate plaintiffs' claims, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), and argues that under that standard the evidence is so one-sided that IDS must prevail on the merits of those claims. *See Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

To establish an ADEA prima facie case under the *McDonnell Douglas* framework, a plaintiff must show:

(1) that he was within the protected age group;

(2) that he performed his job at a level that met his employer's legitimate expectations;

(3) that the employer either terminated the plaintiff, or took some other adverse employment action against him; and

(4) that the employer replaced him with someone else who would provide the same service or skill.

*See, e.g., Clements v. General Accident Ins. Co.*, 821 F.2d 489, 491 (8th Cir.1987) (citation omitted). Once a plaintiff demonstrates a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If the defendant meets this burden, the plaintiff must produce evidence to show that the reason proffered by the defendant was merely a pretext for age discrimination. *Id.*

**47.** The five plaintiffs are: C. Donald Ladd, Thomas LoMacchio, Barry Mates, J. Grant Trauth and Kurt Vezner.

■ It is undisputed that the five plaintiffs subject to this motion are all members of the protected class because they were all over forty years of age when terminated by IDS. IDS contends, however, that the plaintiffs are unable to establish a prima facie case because age was not a determining factor in their terminations. *See, e.g., Tribble v. Westinghouse Elec. Corp.,* 669 F.2d 1193, 1196 (8th Cir.1982) (citations omitted). In cases where plaintiffs present direct evidence of age discrimination, however:

> it is incorrect to rely on a *McDonnell Douglas* form of rebuttal. Under the *McDonnell Douglas* test plaintiff establishes a prima facie case when the trier of fact *believes* the four circumstances ... which give rise to an *inference* of discrimination. Where the evidence for a prima facie case consists ... of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required. Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons. Once an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decisions would have been reached even absent the presence of that factor.

*Perry v. Kunz,* 878 F.2d 1056, 1058 (8th Cir.1989) (quoting *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir. 1982) (emphasis in original)).

The Eighth Circuit has also expressly rejected the *McDonnell Douglas* analysis in the context of federal discrimination class actions. *See, e.g., Craik,* 731 F.2d at 470 n. 7. In such cases, the plaintiff class can establish its prima facie case by proving:

> by a preponderance of the evidence that the defendant engaged in a pattern or practice of unlawful discrimination in various company policies, that 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'

*Id.* at 470 (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). When evaluating such class actions, the court "must first analyze the class claims and if they are sustained, then the court must presume discrimination against the individual claimants." *Roby v. St. Louis Southwestern Ry. Co.,* 775 F.2d 959, 963 (8th Cir.1985). Once a class proves that the employer engaged in a pattern or practice of discrimination, a presumption arises that each plaintiff is entitled to prospective relief; plaintiffs have also made out their prima facie case for purposes of the remedial phase of the lawsuit. *Craik,* 731 F.2d at 470 (citing *Teamsters,* 431 U.S. at 359, 97 S.Ct. at 1866). Proof of a pattern of practice of discrimination thus shifts to the employer the burden of showing that individual class members were not the victims of discrimination. *Teamsters,* 431 U.S. at 359–62, 97 S.Ct. at 1866–68. Moreover, defendants' burden becomes one of persuasion, not merely production. *Craik,* 731 F.2d at 470; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 n. 17 (1st Cir.1979).

Plaintiffs in the present case proffer direct evidence of a pattern and practice of age discrimination in the context of a class action. The court thus rejects IDS's claim that the evidence in this case must be analyzed relying solely on the *McDonnell Douglas* framework. The correct standard is whether the evidence is such that a jury could reasonably find, by a preponderance of the evidence, that IDS followed a pattern or practice of age discrimination and whether IDS can conclusively rebut any resultant presumption of discrimination by establishing that individual plaintiffs were subjected to adverse employment decisions for reasons other than age discrimination. IDS presents evidence of alternative reasons why it terminated the five plaintiffs. This evidence, however, merely raises a material fact dispute because plaintiffs proffer direct evidence of a pattern or practice of age discrimination. Thus, plaintiffs

will prevail unless IDS can meet its burden of persuasion by proving by a preponderance of evidence that individual terminations would have occurred in the absence of the discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989) (plurality opinion). Accordingly, the court denies IDS's motion for summary judgment on the ADEA claims of plaintiffs LoMacchio, Trauth, Mates, Ladd and Vezner based on evidence related to their performance.

▮ IDS also contends that the claims of plaintiffs LoMacchio and Trauth must fail because they were both replaced by older division managers and thus are unable to prove one element of an age discrimination claim under *McDonnell Douglas*. The court, however, rejects this contention because LoMacchio and Trauth are entitled to prove their age discriminations claims independent of the *McDonnell Douglas* framework. As the Eighth Circuit held when reversing summary judgment for an employer in an age discrimination case:

> the trial court failed to recognize that an ADEA plaintiff is not required to prove a prima facie case utilizing only the so-called *McDonnell Douglas* method of proof, but may utilize either that indirect method of proof or may attempt to prove that age was a determining factor in defendant's decision to terminate [plaintiff] utilizing direct evidence. Since that is true, plaintiff ... was not necessarily precluded from making a prima facie case simply because she could not prove one of the elements of the *McDonnell Douglas* test.

*Perry*, 878 F.2d at 1058. Even using the *McDonnell Douglas* analysis, replacement by an older person does not necessarily defeat those plaintiffs' claims because the test, as defined by the Eighth Circuit, does not require replacement by a younger person but rather requires only that the employer "tried to replace [the plaintiff] with someone else who would provide the same service or skill." *Id.* at 1057 (citations omitted). Thus, the court denies IDS's motion for summary judgment on the claims

of plaintiffs LoMacchio and Trauth based on IDS's contention that those plaintiffs were replaced by older persons.

8. *IDS's Motion for Summary Judgment on Plaintiffs' Retaliation Claims*

Plaintiffs assert that IDS has retaliated against them:

A. By imposing various chargebacks against them;

B. By asserting counterclaims to recover debts allegedly owed as a result of those chargebacks;

C. In its administration of their Career Distributors Retirement Plan ("CDRP") accounts;

D. By asserting a counterclaim against Edward Chapdelaine;

E. By discontinuing Truman Crabbe's consulting agreement; and

F. By withholding accounts from Roger Huebner.

Plaintiffs allege that IDS's actions constitute retaliation in violation of both the ADEA and the Employee Retirement Income Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). IDS moves for summary judgment on all of plaintiffs' retaliation allegations based on federal law. The court will examine each allegation in turn to determine whether summary judgment is appropriate.

A. The Claims Based on IDS's Chargeback System

Prior to becoming division managers, each plaintiff executed a copy of a division manager agreement ("agreement") that defined the terms of employment. The agreement set forth a compensation system under which division managers are paid overwriting commissions based on the sale of financial products made by either district managers or financial planners under the division manager's supervision. The agreement further provides for the assessment of various chargebacks against that compensation. Plaintiffs contend that two particular deductions are prohibited: chargebacks for a portion of the compensation paid to marginal or unsuccessful first-

year planners ("PVS chargebacks") [48] and chargebacks for unoccupied divisional office space ("rent chargebacks"). [49]

■ The ADEA prohibits retaliation against persons who bring charges of age discrimination, specifying that:

It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d) (1988). Courts analyze ADEA retaliation claims in the same manner in which they analyze retaliation claims brought under Title VII. *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154 (8th Cir.1989). To establish a prima facie case of retaliation, plaintiffs must demonstrate:

1. That they engaged in conduct protected by the ADEA;

2. That they were subjected to adverse employment action at the time of, or after, the protected conduct occurred; and

3. That a causal link exists between the protected activity and the adverse employment action.

*Id.* at 1154–55. [50] Adverse employment actions that occurs before plaintiffs engage in protected conduct, however, cannot constitute retaliation. *See, e.g., Reaves v. Westinghouse Elec. Corp.*, 683 F.Supp. 521, 527 n. 7 (D.Md.1988) (finding no retaliation when employer's investigation, which ultimately led to employee's discharge, had begun before employee filed a charge with the EEOC). In the present case, IDS's policy of assessing chargebacks was instituted well before plaintiffs filed this action; plaintiffs concede that IDS began assessing the allegedly illegal chargebacks "[b]eginning in or about 1987". Moreover, all the challenged chargebacks were incurred pursuant to the provisions of the plaintiffs' division manager agreements, all of which were entered into long before this lawsuit began in January 1989. Plaintiffs further admit that they "do not allege that actions which IDS took prior to the filing of this lawsuit were retaliatory for the filing of the suit." Based on the foregoing, plaintiffs cannot establish that the challenged chargebacks were imposed at the same time, or after, plaintiffs engaged in protected conduct or that the chargebacks were imposed in retaliation for plaintiffs' participation in this lawsuit. The court therefore grants IDS's motion for summary judgment on plaintiffs' claims under both the

---

**48.** Under the PVS system, which was introduced on a trial basis in 1986 and implemented nationally in 1987, IDS charges division managers for a portion of the compensation which had been paid to first-year financial planners who either failed to achieve 1.4 million dollars in total weighted production during their first year with IDS or who ended their employment with IDS before completing their first year with a total weighted production of less than 1.4 million dollars on an annualized basis. IDS deducts those charges from division managers' compensation.

**49.** Plaintiffs specifically allege that:

Beginning in or about 1987, IDS began assessing illegal chargebacks against division managers for office, administrative, and other expenses, including expenses for new planners who did not meet the performance criteria established by IDS.

. . . . .

Enforcement and assessment of the aforesaid chargebacks against the Plaintiffs constitutes illegal retaliation under the ADEA....

*Glass*, Second Amended Class Action Complaint, ¶¶ 94, 99; *Stephens*, Third Amended Class Action Complaint, ¶¶ 135, 140. The allegedly illegal chargebacks were also listed in plaintiffs' discovery responses, although plaintiffs' calculations do not include any damage figures for rent chargebacks.

**50.** Plaintiffs also bring claims pursuant to Section 510 of ERISA, 29 U.S.C. § 1140 (1988). The wording of Section 510 is very similar to the anti-retaliation provisions of the both the ADEA and Title VII. Courts analyze Section 510 claims relying on the same methods used to evaluate retaliation claims under the ADEA and Title VII. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111–13 (2d Cir.1988). Thus, the court applies the same analysis to plaintiffs' retaliation claims brought under the ADEA and ERISA.

ADEA and ERISA concerning the assessment of the challenged chargebacks.

### B. IDS's Counterclaims to Recover Debt Owed As a Result of the Chargebacks

IDS also brings counterclaims against various plaintiffs for the amount of their unpaid debt incurred as a result of the chargebacks.[51] Plaintiffs contend that IDS asserts those counterclaims in retaliation for plaintiffs' participation in this lawsuit.[52] IDS responds that the counterclaims are not retaliatory because they flow from the express terms of the division manager agreements, which were entered into long before plaintiffs brought suit. In those agreements, IDS specifically reserved the right to offset chargebacks against compensation owed to the division managers. The agreements further provide that the managers, upon termination, remain responsible both for debts already calculated and also for those charges which cannot be calculated, and thus not assessed, until after termination.

IDS further contends that the chargeback counterclaims are compulsory, and thus cannot support a claim of retaliation.[53] Courts conduct four inquiries when determining whether a counterclaim is compulsory:

1. Are the issues of fact and law raised by the claim and counterclaim largely the same?

2. Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

3. Will substantially the same evidence support or refute plaintiff's claim and defendant's counterclaim?

4. Is there any logical relation between the claim and counterclaim?

*See, e.g., Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 264 (8th Cir. 1979). An affirmative answer to any one of those questions means that the counterclaim is considered compulsory for purposes of Federal Rules of Civil Procedure 13(a).[54] *See* 6 Charles A. Wright, Arthur

**51.** Those plaintiffs are: Rosevelt Bass, Truman Crabbe, Vincent Enright, Maurice Harrington, Roger Huebner, Thomas LoMacchio, John Lose, Barry Mates, Robert Novak, Gayle Parrack, Donald Raes, Agnes Savadel, Thomas Sinyard, Donald Stephens and Robert Wilber.

**52.** Plaintiffs' claims of retaliation concerning the chargebacks are somewhat confused. In their complaints, they allege that the very practice of assessing chargebacks constitutes retaliation. As stated above, IDS is entitled to summary judgment on that claim. On the other hand, plaintiffs' response to Interrogatory No. 102 seems to confine their retaliation claim to IDS's counterclaims for chargeback debt owed by the sixteen plaintiffs.

**53.** IDS urges the court to adopt a rule that good faith compulsory counterclaims can never constitute retaliation. Neither plaintiffs nor IDS have located a case that either supports or rejects this proposition. The court declines to adopt IDS's proposed rule because it is unnecessary on the facts of the present case. The court notes, however, that the anti-retaliation provisions of the ADEA and Title VII are designed principally to deal with retaliatory conduct that occurs outside the judicial system, for example: demotion, *Smith v. Columbus Metro. Hous. Auth.*, 443 F.Supp. 61, 62 (S.D.Ohio 1977); termination, *EEOC v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66, 68 (S.D.N.Y.1975); poor evaluations, *Mead v. United States Fidelity & Guar. Co.*, 442 F.Supp. 114, 123 (D.Minn.1977); and loss of

normal work assignments, *Minor v. Califano*, 452 F.Supp. 36, 42–43 (D.D.C.1978); *see generally* Barbara Lindemann Schlei & Paul Grossman, *Employment Discrimination Law* 227–29 (David A. Cathcart & R. Lawrence Ashe, Jr. eds., 2d ed. Supp.1989) (discussing retaliation). Anti-retaliation provisions prevent employers from intimidating plaintiffs thereby discouraging plaintiffs from seeking legal remedies. Once a lawsuit has been filed, courts have the tools to deal with counterclaims that are truly retaliatory or made in bad faith.

**54.** Federal Rule of Civil Procedure 13(a) requires that:

[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

The purpose of the compulsory counterclaim rule is to dispose of all disputes that arise from one set of facts during one action rather than litigating the disputes in numerous lawsuits, "thus administering complete and even handed justice expeditiously and economically." *See, e.g., Blair v. Cleveland Twist Drill Co.*, 197 F.2d 842, 845 (7th Cir.1952). If an action proceeds to judgment without the interposition of a compulsory counterclaim, that counterclaim "is there-

R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1410, at 57–58 (2d ed. 1990).

Plaintiffs initially challenged the deductions by alleging in their complaints that the debt constitutes "illegal chargebacks" and seeking damages of "twice the amount of the wrongfully deducted chargebacks." IDS's answer and counterclaims assert not only that the chargebacks were legally assessed but also that those debts are actually owed pursuant to the terms of the division manager agreements. Those counterclaims arise out of the same transaction or occurrence as plaintiffs' claims because substantially the same evidence will support or refute both the claims and counterclaims and they are logically related. *Cochrane*, 596 F.2d at 264.[55] IDS's decision to bring all of its chargeback claims in the present lawsuit is consistent with judicial economy and is required by Federal Rule of Civil Procedure 13(a).

Plaintiffs argue, however, that IDS was not required to assert those counterclaims in order to obtain a ruling in its favor on the chargeback issue, but rather that IDS merely needed to successfully defend against plaintiffs' chargeback claims. The court rejects this argument. Even if IDS successfully defended against plaintiffs' original claims, it would merely vindicate the validity of its chargeback system. IDS would be still unable to collect on the underlying debts because its successful defense would not result in judgments against plaintiffs for the amount of those debts. IDS would be forced to file duplicative lawsuits in various states to recover from those debtors. Moreover, the debtors could defend against those suits by arguing that IDS's recovery is barred, either as

a result of its failure to plead a compulsory counterclaim in the present action, or because it waived its rights by failing to assert the counterclaims in this case, where the legality of the debts is at issue.

■ Even if plaintiffs are correct in their contention that IDS's chargeback counterclaims are permissive, plaintiffs present insufficient evidence of IDS's retaliatory intent. All of the chargebacks were incurred pursuant to the provisions of division manager agreements and it is undisputed that all of those agreements were entered into long before this lawsuit began in January 1989. Plaintiffs initially raised the validity of the chargebacks in their complaints, and IDS merely asserted counterclaims flowing from the terms of the agreements in response to plaintiffs' claims. The court thus determines that plaintiffs fail to raise a material fact dispute regarding IDS's allegedly retaliatory motive. Based on the foregoing, the court grants IDS's motion for summary judgment on plaintiffs' claims of retaliation under the ADEA and ERISA based on IDS's chargeback counterclaims.

### C. Plaintiffs' Retaliation Claims Concerning IDS's Administration of the CDRP Plan

■ IDS maintains separate retirement plans for its independent contractors and its division managers. IDS provides the Career Distributors Retirement Plan ("CDRP") for its independent contractors. Pursuant to the terms of the CDRP document, IDS has the right to offset debts owed by an individual against the value of that person's CDRP account. IDS has made such offsets against the CDRP accounts of two plaintiffs, Carolyn Treaster

after barred." *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974).

**55.** Plaintiffs rely on *Cooper v. Pic–Walsh Freight Co.,* 27 Fair Empl.Prac.Cas. (BNA) 344, 1976 WL 12 (E.D.Mo.1976), to support their contention that IDS's counterclaims may constitute impermissible retaliation. *Cooper,* however, is distinguishable because it dismissed an employer's counterclaim for malicious prosecution that was asserted after an employee filed a single Title VII complaint. The court reasoned that

"to entertain claims in the nature of malicious prosecution" for filing Title VII claims "would seriously undermine the clear policy" of the Title VII anti-retaliation provisions. *Id.* In the present case, the subject of IDS's counterclaims is not related to any protected activity of the plaintiffs, whether it be filing a lawsuit or a charge. As discussed above, IDS's counterclaims arise directly out of plaintiffs' claims regarding the chargebacks, thus the situation is distinguishable from *Cooper.*

and Junior Klukas. In both cases, it is undisputed that the offsets occurred well before this lawsuit was commenced. In Treaster's case, IDS offset her debt against her CDRP account in the middle of 1987. Klukas' CDRP account was offset in 1988. Thus, the offset against Treaster's account occurred eighteen months before this lawsuit began; the offset against Klukas' account occurred six months before the commencement of this action.

Although IDS has yet not offset the CDRP account of plaintiff Donald Raes, it has withheld his CDRP payments. In the fall of 1988, the amount of Raes's debt to IDS exceeded the value of his CDRP account. IDS began withholding Raes' CDRP payments at that time, before Raes filed his charge of age discrimination with the EEOC, on January 24, 1989, and before this lawsuit was filed, on January 27, 1989.

Any adverse action or threat of adverse action against the CDRP accounts of those three plaintiffs occurred prior the institution of this lawsuit and prior to the time when Raes filed his charge. Thus, the challenged actions occurred prior to any protected conduct and IDS's motion for summary judgment on the retaliation claims of Treaster, Klukas and Raes is granted. *See Wentz,* 869 F.2d at 1154–55 (plaintiffs must show that adverse employment action took place at the time of, or after, the protected conduct occurred); *Reaves,* 683 F.Supp. at 527 n. 7 (no retaliation for adverse employment action taken before plaintiffs engage in protected conduct).

Plaintiffs also contend that they are entitled to an injunction barring IDS from deducting plaintiffs' alleged chargeback debts from their CDRP accounts. To obtain such relief, plaintiffs must demonstrate that there is a cognizable danger of future misconduct, that the danger is more than a mere possibility, that irreparable injury is likely to occur and that legal remedies are insufficient. *See, e.g., Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982). Plaintiffs argue that IDS's allegedly illegal conduct in the past demonstrates a cognizable danger of future age discrimination violations and that IDS's primary means to retaliate against plaintiffs would be to set off their chargeback debts against their CDRP accounts.[56] Plaintiffs allegations, however, are insufficient to demonstrate that there is a cognizable danger of future misconduct or that irreparable harm is likely to occur. It is undisputed that IDS has not withheld any CDRP payments other than Raes's payments. Plaintiffs further concede that IDS has not set off any CDRP accounts since this litigation commenced. In addition, plaintiffs make no allegations nor proffer any evidence suggesting that IDS has retaliated against any plaintiffs concerning the administration of their CDRP accounts or concerning the administration of CDRP generally. Moreover, an improper CDRP deduction may be remedied with money damages. Plaintiffs thus fail to show that they have a right to injunctive relief and the court grants IDS's motion for summary judgment on all aspects of plaintiffs' retaliation claims concerning their CDRP accounts.

### D. IDS's Motion for Summary Judgment on Its Counterclaim Against Edward Chapdelaine

IDS asserts a counterclaim against Edward Chapdelaine based on his alleged failure to properly supervise three planners and his alleged failure to immediately inform IDS once he had discovered that those planners sold an illegal investment.[57] IDS alleges claims of negligent supervision, misrepresentation, breach of contract and liability for contribution and indemnity.

---

**56.** Plaintiffs specifically contend that:
IDS has retaliated or has threatened to retaliate against members of the Plaintiff class who are covered by and entitled to benefits under and pursuant to the CDRP by reducing, withholding, refusing to distribute, or otherwise adversely affecting the amount of the benefits to which said Plaintiffs are entitled under the CDRP and by affecting the time of distribution of such benefit payments.
*Glass,* Second Amended Class Action Complaint, ¶ 83; *Stephens,* Third Amended Class Action Complaint, ¶ 130.

**57.** Chapdelaine also moves for summary judgment on this counterclaim. *See infra.*

Following the analysis used to evaluate IDS's chargeback counterclaims, the court determines that plaintiffs also fail in this instance to raise a material fact issue regarding an improper retaliatory motive by IDS in bringing the counterclaim against Chapdelaine. Accordingly, IDS's motion for summary judgment on plaintiffs' retaliation allegations based on Chapdelaine's counterclaim is granted.

### E. Plaintiffs' Retaliation Claim Based on IDS's Discontinuance of Truman Crabbe's Consulting Agreement

Truman Crabbe ceased being a division manager on June 30, 1988. On July 1, 1988, he became a consultant for IDS. His principal responsibility was to assist two IDS divisions in the area of recruiting. Toward the end of his first year as a consultant, IDS told Crabbe that it would not extend his consulting arrangement beyond the first year. IDS contends that Crabbe's consulting agreement was not extended because, although he got good reviews for his work in one division, his work was not considered beneficial in other divisions.

Bonnie Anderson, a manager of Planner Relations of the Field Human Resource Department of IDS, wrote a note on April 6, 1989, to William McKinney, vice president for field support services, concerning the possible extension of Crabbe's consulting agreement. The note states that:

> I totally agree with you [sic] position, spoke to Steve [Kumagai] also and he agrees. I said I would call him but haven't been able to reach him. In light of the fact that he has joined the class action "age suit," I think it's best for you to send your "thanks but no thanks" formal letter??! Thanks, Bonnie.

Plaintiffs contend that Anderson's note is direct evidence that IDS retaliated against Crabbe when it decided not to renew his consulting arrangement. Although IDS admits that Anderson's note could, "on first impression ... be construed as being retaliatory", IDS contends that because Anderson, in her deposition, gave a nondiscriminatory explanation for the note, Crabbe must show that her explanation is pretextual in order to avoid summary judgment. In cases involving direct evidence of discrimination, however, plaintiffs need not rely on the *McDonnell Douglas* framework to meet their burden of proof. *Perry v. Kunz,* 878 F.2d at 1059; *see also supra.*

■ IDS also argues that Crabbe's deposition testimony demonstrates that IDS did not retaliate against him. Deposition testimony can constitute a judicial admission that binds a party only where such testimony is "deliberate, clear and unequivocal." *Backar v. Western States Prod. Co.,* 547 F.2d 876, 880 n. 4 (5th Cir.1977) (citing *Anderson Brothers Corp. v. O'Meara,* 306 F.2d 672, 676 (5th Cir.1972)). A "broad and general admission", however, will not be construed to mean "something quite specific and unintended by the party making the admission." *Fleming v. Kane County,* 116 F.R.D. 567, 574 (N.D.Ill.1987). Crabbe did testify that he was not aware of any retaliation against him. He further testified, however, that he had no way of knowing how IDS retaliated against him. The court finds that Crabbe's deposition testimony is too ambiguous to constitute a judicial admission, thus he has not waived his retaliation claim by failing to mention it in his deposition. His testimony may be considered merely as "one factor to be considered by the finder of facts." *Backar,* 547 F.2d at 880 n. 4 (citing *Anderson,* 306 F.2d at 676).

Based on the foregoing, the court finds that there is a material fact dispute regarding the reasons for the nonrenewal of Crabbe's consulting arrangement and the meaning of Anderson's note, and thus denies IDS's motion for summary on Crabbe's retaliation claim.

### F. Plaintiffs' Retaliation Claims Concerning Roger Huebner

Plaintiffs assert that IDS retaliated against Roger Huebner based on the statement of an IDS employee who told Huebner that he was not getting any accounts because IDS's regional vice president, Bill Darland, was "furious" with him. In his deposition of October 25, 1990, however, Huebner testified that he did not even

know whether IDS was aware of the fact that he had filed a charge. Plaintiffs present no other evidence to support Huebner's retaliation claim and nor do they address the claim in their brief. Plaintiffs therefore fail to raise a material fact issue and the court grants IDS's motion for summary judgment on Roger Huebner's retaliation claim.

In summary, the court grants IDS's motion for summary judgment concerning all of plaintiffs' allegations of retaliation under federal law except to the extent that those allegations involve IDS's failure to renew Truman Crabbe's consulting agreement. The court denies IDS's motion for summary judgment on Crabbe's allegations of retaliation.

### 9. Cross–Motions for Summary Judgment on Plaintiffs' ERISA Claims

Plaintiffs and IDS both move for summary judgment on plaintiffs' ERISA claims involving IDS's Career Distributors Retirement Plan ("CDRP").[58] IDS is organized into thirteen marketing regions, each of which is headed by a regional vice president. Those regions are further divided into approximately 170 divisions, each of which is headed by a division manager. The divisions are subdivided into districts, which are headed by district managers. District managers sell products and financial plans and also oversee the work of the financial planners, who constitute the vast majority of IDS's sales force. IDS's district managers and financial planners are considered independent contractors for purposes of most of their activities, while the division managers are deemed employees for purposes of all of their activities.[59]

IDS established the CDRP for the benefit of the district managers and financial planners, and maintains a separate retirement plan for its division managers, the Marketing Managers' Retirement Plan ("MMRP"), which is covered by ERISA and in which benefits accrued by division managers in their capacity as employees are accumulated until retirement.[60]

IDS generally promotes from within: financial planners are promoted to the position of district manager and district managers are promoted to division managers. IDS has a compensation system based on sales. A portion of that compensation is tied to renewals, thus some compensation trails behind the original sales activity that generated it. For example, long after becoming a division manager and employee, a person's life insurance sales while an independent contractor may continue to generate renewal commissions. Thus, division managers, who participate as employees in the MMRP, may also have benefits flowing to their CDRP accounts from that trailing compensation. In addition, one component of the formula used to determine what percentage of any trailing income will be allocated as CDRP credit is a division manager's current earnings as an employee. This percentage figure increases as a division manager's income increases. It is undisputed, however, that the percentage figure is then applied only to those commission amounts trailing from the time when a division manager was an independent contractor. Because division managers are IDS employees who nonetheless may continue to accrue CDRP benefits, plaintiffs contend that the CDRP provides retirement income to employees and thus is an "employee pension benefit plan" covered by

---

**58.** In Count III of their complaints, plaintiffs assert claims for damages and declaratory relief.

**59.** In a 1975 letter ruling, the Internal Revenue Service determined that division managers are employees for purposes of all their activities; that district managers are employees for purposes of their training duties and independent contractors with respect to all of their other activities, and that financial planners are employees in their first year with IDS and independent contractors thereafter.

Although plaintiffs seek to dispute the letter ruling, they fail to come forward with any facts that undermine the IRS's conclusions. They also cite three cases which they contend demonstrate that the financial planners and district managers are employees, but proffer no facts to support that contention.

**60.** MMRP benefits derive from activities that an individual performs for IDS pursuant to an employment agreement.

ERISA. They further contend that IDS has violated protections afforded by ERISA by either deducting funds from plaintiffs' CDRP accounts or withholding or eliminating their CDRP benefits. Plaintiffs ask the court to declare that the CDRP is covered by ERISA, to prohibit further deductions from their CDRP accounts, to order IDS to return all prior deductions and to pay interest on those deductions for the period of time that IDS held those funds. Plaintiffs also seek costs and attorney's fees.

IDS maintains, however, that once a person establishes employee status as a division manager, all benefits based on that status accrue to the MMRP. Any benefits accruing to the person's CDRP account would result from trailing compensation earned while an independent contractor. IDS thus moves for summary judgment on plaintiffs' ERISA claims, claiming that the CDRP is not covered by ERISA because it is composed solely of funds generated by plaintiffs when they were independent contractors.

■ The issue presented by the structure of the CDRP is apparently one of first impression. Under ERISA, a plan is considered an "employee pension benefit plan":

> to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>> (i) provides retirement income to employees, or
>> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A) (1988). ERISA thus protects plans for employees, not independent contractors. *See, e.g., Wolcott v. Na-*

*tionwide Mut. Ins. Co.,* 884 F.2d 245, 250–51 (6th Cir.1989) (commissioned insurance agent was independent contractor not employee, thus not covered by ERISA). ERISA regulations further state that:

> For purposes of Title I of the Act and this chapter, the term "employee benefit plan" shall not include any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan....

29 C.F.R. § 2510.3–3(b) (1991). The terms of the plan document dictate whether and to what extent an employee is "covered" by defining the relationship between the services performed and the benefits provided. *See, e.g., Wardle v. Central States, S.E. & S.W. Areas Pension Fund,* 627 F.2d 820, 822–23 (7th Cir.1980).

■ Turning to the CDRP, the court first determines that under the express terms of the plan document, the CDRP is designed to provide retirement benefits only for independent contractors.[61] Although division managers may accrue benefits under the terms of the CDRP, those benefits flow only from their prior activities as independent contractors, thus for purposes of ERISA, division managers as employees are not "covered" by the CDRP. *See, e.g., Short v. Central States, S.E. & S.W. Areas Pension Fund,* 729 F.2d 567 (8th Cir.1984) (employees not "covered" because during the period of time in which they were self-employed truck drivers, they were not performing the particular services for which the plan was intended to return benefits). The court notes that the amount of CDRP benefits thus accrued may vary slightly as a result of the level of a division manager's salary as an employee. The court nonetheless concludes that the benefits themselves are based on trailing, independent contractor earnings, not employee earnings, because if a division manager has no trailing income, there will be no CDRP benefits, no matter what amount of income

---

**61.** For example, the first sentence of the plan document states that:

> IDS ... has established the Career Distributors' Retirement Plan (Plan) to provide retire-

ment benefits for full-time financial planners and district managers of [IDS] and its subsidiaries.

(1988 CDRP plan document § I).

the division manager earns as an employee. Moreover, ERISA specifically provides that the determination of whether a plan is an "employee benefit pension plan" is made independently of the methods used to calculate the contributions or benefits of the plan. 29 U.S.C. § 1002(2)(A) (1988). The court thus rejects plaintiffs' contention that division managers' CDRP credits are "based" on their earnings as employees.

The court further determines that the surrounding circumstances indicate that the CDRP is not intended to cover employees. IDS maintains the MMRP as a separate pension plan that is governed by ERISA and includes benefits accumulated by the division managers in their status as employees.[62] The MMRP was set up in 1975, the year in which division managers were reclassified as employees rather than independent contractors and the year in which ERISA became effective. Plaintiffs have also testified repeatedly about the differences between the two plans, including their understanding that the CDRP covers independent contractors while the MMRP covers division managers. *See Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 634 (W.D.Wisc.1979) (participants and administrators' understanding of the nature and scope of plan benefits are "surrounding circumstances" which may be used to ascertain whether a plan is employee retirement plan). IDS also distributes a description of the CDRP to individuals when they become financial planners as part of their planners benefit manual.[63] It is only after becoming division managers that employees are provided with a description of the MMRP. *See id.* at 634 (manner in which plan document is distrib-

uted may also indicate whether plan is a retirement plan for employees). The surrounding circumstances and the language of the plan document indicate that the CDRP provides retirement benefits for independent contractors, not employees, and thus ERISA does not govern the CDRP.

■ Based on the foregoing, the court concludes that the CDRP is not an "employee pension benefit plan" pursuant to ERISA, and therefore grants IDS's motion for summary judgment and denies plaintiffs' motion for summary judgment on plaintiffs' ERISA claims contained in Count III of their complaints.

10. *IDS's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' State Law Chargeback Claims*

In addition to retaliation claims based on federal law, various plaintiffs assert chargeback claims pursuant to Minn.Stat. § 181.79.[64] Plaintiffs allege that in or about 1987, IDS began assessing illegal chargebacks against plaintiffs and that IDS required plaintiffs to repay those chargeback amounts from bonuses, earned commissions and retirement benefits. *See Glass*, Second Amended Class Action Complaint, ¶¶ 93–94; *Stephens*, Third Amended Class Action Complaint, ¶¶ 134–135. Plaintiffs challenge two particular deductions: chargebacks for a portion of the compensation paid to marginal or unsuccessful first-year planners (PVS chargebacks) and rent chargebacks for unoccupied divisional office space. *Glass*, Second Amended Class Action Complaint, ¶ 95; *Stephens*, Third

---

**62.** The MMRP plan document states that the purpose of the plan is to provide retirement benefits for:

for any person serving as a Divisional Sales Manager pursuant to a written employment agreement.

(MMRP plan document, Article I, Article II § 2.1).

**63.** That manual also states that CDRP benefits are based on independent contractor earnings.

**64.** That section provides that:

No employer shall make any deduction, directly or indirectly, from the wages due or

earned by any employee, who is not an independent contractor, for lost or stolen property, damage to property, or to recover any other claimed indebtedness running from employee to employer, unless the employee, after the loss has occurred or the claimed indebtedness has arisen, voluntarily authorizes the employer in writing to make the deduction or unless the employee is held liable in a court of competent jurisdiction for the loss or indebtedness.

Minn.Stat. § 181.79, subd. 1.

Amended Class Action Complaint, ¶ 136.[65] Plaintiffs allege that IDS failed to obtain their written authorization to make those deductions after the events which gave rise to the indebtedness occurred, thereby violating Minn.Stat. § 181.79. Plaintiffs move for partial summary judgment on this issue.[66] IDS also seeks summary judgment, arguing that those adjustments did not violate the statute.

According to the Minnesota Supreme Court, Section 181.79 is "only applicable to deductions taken from earned wages or commissions." *Stiff v. Associated Sewing Supply Co.*, 436 N.W.2d 777, 780 (Minn. 1989). Section 181.79 thus applies only when a disputed deduction is made from an employee's undisputed earnings. *Id.* at 780. In the present case, the division manager agreement ("agreement") signed by each plaintiff sets forth a commission-based system of compensation.[67] Since 1978, the sales compensation plan has defined various chargebacks and bonuses that adjust the division managers' gross sales commissions.[68] Division managers

receive bi-weekly commission checks and detailed commission statements that reflect the status of their overwriting commissions, bonuses and chargebacks on an ongoing basis. According to the terms of the agreements, each check and commission statement represents a final accounting for the relevant pay period. Thus, the commission statements reflect an accurate picture of the division managers' debit or credit balance as of the end of that period.

Under the division manager's compensation system, plaintiffs were thus not entitled to be paid the total amount of gross commissions resulting from the sales by their financial planners or district managers. IDS still had to adjust those gross commissions by adding or subtracting any rental chargebacks, PVS chargebacks or bonuses, and any other chargebacks or additions before it paid the division managers the amount of their net commission due. Thus, gross commissions were not "due and earned", within the meaning of the statute, until after those adjustments. *Oja v. Dayton Hudson Corp.*, 458 N.W.2d 169,

---

**65.** Plaintiffs also contend that after termination or retirement, IDS continued to illegally withhold retirement benefits and earned commission as a result of the chargebacks. *Glass*, Second Amended Class Action Complaint, ¶ 97; *Stephens*, Third Amended Class Action Complaint, ¶ 138.

**66.** Although plaintiffs' complaints assert that the PVS and rent chargebacks both violate state law, plaintiffs' motion for partial summary judgment concerns only the PVS chargebacks. IDS, however, moves for summary judgment on all of plaintiffs' chargeback claims based on state law.

**67.** Division managers are paid commissions on the sales of products and services made by district managers and financial planners who are under the division managers' supervision. The overwriting is paid to the division managers "in accordance with commission rules and policies set forth in the Sales Compensation Plan at the time of such sale, and on such other basis as [IDS] will designate from time to time." *See, e.g.*, Division Manager ("DVM") Agreement 1199, § VI(a); DVM Agreement 1198, § VI(a); Joint DVM Agreement 1157, § VI(a). The sales compensation plan, as defined by the DVM agreements, refers to the rules, policies and schedules as amended and published from time to time that relate to "the assignment or reassignment of territory Client Accounts, the pay-

ment of overwriting commissions and other fees or compensation and the imposition of chargebacks." *See, e.g.*, DVM Agreement 1199, § I(k); DVM Agreement 1198, § I(h); Joint DVM Agreement 1157, § I(j).

In addition to the chargebacks identified in the sales compensation plan, the DVM agreements also make the division managers liable for other specific charges, including charges for expenses incurred in rendering financial services and charges for a portion of the compensation paid to first-year planners under the division managers' supervision who turn out to be marginal performers. IDS also specifically reserves the right to offset those chargebacks against any amount which it owes the division managers. *See, e.g.*, DVM Agreement 1199, § VI(g); DVM Agreement 1198, § 6(g); Joint DVM Agreement 1157, § VI(f). Moreover, the DVM agreements provide that upon termination or retirement the division managers remain responsible for any unpaid debit balance already calculated and also for those unpaid charges which cannot be calculated until after termination or retirement. *See, e.g.*, DVM Agreement 1199, § X(d); DVM Agreement 1198, § X(d); Joint DVM Agreement, § X(e).

**68.** The chargebacks are based on various factors, including planner performance, rent, sales reversals, the debit balance of planners in a division, the training of new planners and advances.

170–71 (Minn.Ct.App.1990) (holding that sales person's commission was not "due or earned" until employer had subtracted various deductions for returned merchandise from sale person's gross sales). IDS was also not required to obtain the division managers' written authorization prior to making those deductions. Thus the disputed chargebacks do not violate Minn. Stat. § 181.79. *Oja*, 458 N.W.2d at 171 (similar compensation system, which deducted various costs from gross commissions without employee's written authorization, did not violate § 181.79). Accordingly, IDS's motion for summary judgment on plaintiffs' state law chargeback claims is granted and plaintiffs' motion for partial summary judgment on the PVS chargebacks is denied.

11. *IDS's Motion for Summary Judgment on Plaintiffs' Claims for Intentional Infliction of Emotional Distress*

Various plaintiffs assert claims for intentional infliction of emotional distress.[69] IDS moves for summary judgment on all of those claims. The facts relevant to this motion are lengthy.[70] Although the court has thoroughly scrutinized the parties' memoranda submitted in connection with this motion, the court will not restate all the facts relevant to each plaintiff's claim. Rather, because the court has concluded that plaintiffs' claims may be resolved by reference to IDS's alleged conduct, the court will focus on plaintiffs' factual allegations related to the "conduct" element of plaintiffs' intentional infliction of emotional distress claims.

A. IDS's Alleged Conduct

Plaintiffs maintain that they were subjected to IDS's intentional pattern of conduct aimed at reducing the average age of IDS's middle-level management. In short, they contend that they were the victims of IDS's "abusive, humiliating, harassing and emotionally debilitating" age discrimination. (Pls.' Mem.Opp'n Summ.J. on Intentional Infliction Claims at 1). In addition to the age discrimination claims, plaintiffs cite specific instances of conduct on which they base their intentional infliction of emotional distress claims. The specific factual allegations on which each plaintiff relies are set forth below.

Plaintiff Rosevelt Bass contends that IDS and his regional vice president imposed impossible business-related goals on him, interfered with his management of his division and permitted the competition to raid his division by failing to take the action necessary to keep the division's top producer and several other planners from defecting to the competition.

Plaintiff Richard Dean alleges that his regional vice president mistreated him in connection with his termination and that Dean felt "betrayed" by the manner in which his regional vice president related to him during the time surrounding his termination.

Plaintiff Vincent Enright asserts that his regional vice president and IDS's senior vice president and general sales manager set production goals for him that were unreasonable and engaged in various employment-related conduct that made attainment of those goals impossible.

Plaintiff John Evans maintains that IDS used a number of coercive tactics to obtain his resignation. Specifically, Evans alleges that IDS set unattainable performance goals for him, made ageist comments to him, indicated that he could resign and that he would be replaced by his son, announced the vacancy of his position in a national publication prior to his resignation, and made him feel as though his job would be in jeopardy if he took any vacation time.

---

**69.** Plaintiffs Edward Chapdelaine, Carolyn Treaster and Truman Crabbe voluntarily dismissed their claims for intentional infliction of emotional distress prior to IDS's filing of its motion for summary judgment on those claims.

**70.** IDS's memorandum in support of its motion for summary judgment on plaintiffs' claims for intentional infliction of emotional distress contains 153 pages of facts. Plaintiffs' memorandum in opposition to IDS's motion contains 165 pages of facts.

Plaintiff Gerald Gant contends that IDS put him on a "treadmill" of unattainable goals and then took actions to assure that he could not reach those goals. Additionally, Gant asserts that he was the subject of severe criticism from senior IDS personnel even when he was successful at his job. Finally, Gant maintains that IDS humiliated and isolated him after he had accepted a less prestigious position with the company by requiring him to perform certain job-related tasks and forcing him to sign an agreement which provided that he would be available at the convenience of his younger replacement.

Plaintiff Milo Glass contends that his regional vice president solicited complaints about Glass from Glass's co-workers in order to justify his termination. Glass also points to an IDS meeting at which his termination was announced, he was awarded his 35-year company pin, everyone in the room was asked to give Glass a standing ovation and Glass was requested to give a talk to the group which consisted of IDS employees that he had hired and trained. Finally, Glass contends that after he was terminated from his position as division manager and became an IDS planner he was ostracized by the divisional office and was required to perform certain job-related duties that were "beneath [his] dignity."

Plaintiff Maurice Harrington contends that IDS provided no support to him in his position as the Norfolk division manager, and then chose his successor for that position and falsely represented to Harrington that his job with IDS was safe if his division continued to show improvement.

Plaintiff Roger Huebner maintains that he was the victim of an intentional campaign to undermine him that was led by his regional vice president. Huebner contends that his regional vice president falsely accused him of not performing his duties related to recruiting, misinformed him of the salary he would be earning in his new position as an IDS division manager, continually changed recruiting goals which Huebner was required to attain and then provided no assistance to Huebner in reaching those goals, encouraged planners in Huebner's division to transfer to another division, and provided false information to senior IDS management regarding Huebner.

Plaintiff Junior Klukas asserts that his regional vice president set unrealistic and unattainable production goals for him and made various statements that were unsupportive of Klukas's attempts to reach those goals. Klukas further contends that after he resigned as a division manager and became an IDS planner another planner was permitted to handle an account that belonged to Klukas.

Plaintiff C. Donald Ladd contends that IDS, through Ladd's regional vice president, spread rumors about Ladd including allegations of drug use and alleged improprieties in the handling of IDS's financial accounts, consistently raised questions about sexual harassment charges brought against Ladd even after those charges had been resolved, violated the IDS policy of "management point of view" which required complaints to flow through a specified chain of command, attempted to destroy Ladd's social relationships with his co-workers, and fired him without any advance notice on a day when he was home ill.

Plaintiff Gerald Learned maintains that he was not given any explanation for IDS's decision to request his resignation from his division manager position. Learned also contends that after he later accepted a position with IDS as a district manager, IDS sought his resignation from that post although he had been given no performance review.

Plaintiff Thomas LoMacchio alleges that after IDS had moved him to various locations throughout the country, IDS revoked a promise that it would pay his moving expenses, placed him on a production "treadmill" by setting unreasonable and unattainable production goals and then terminated him from his position as division manager without any prior notice.

Plaintiff John Lose contends that IDS sent him a letter stating that he had been overpaid on his commission statement by a

certain amount when in fact his overpayment was significantly less than IDS claimed. Additionally, Lose asserts that the IDS "home office" had promised him new offices for two to three years but had never followed through on this promise, and that his retirement was announced at a divisional meeting when in fact he had no plans to retire.

Plaintiff Barry Mates maintains that IDS acquiesced in his subordinates' characterization of him as "Hitler," "hallway Hitler" and "the cheap Jew."[71] Additionally, Mates alleges IDS gave him a very short period of time in which to rectify the negative tension that existed in his office, provided him no support in resolving his office problems, and after his termination, ordered him to stay out of the office.

Plaintiff Robert Novak alleges that he received little support from his regional vice president in attaining his production goals and that a competitor raided the personnel from his division.

Plaintiff Gayle Parrack contends that his regional vice president intentionally ignored the IDS "management point of view" policy and disregarded the appropriate chain of command to foment dissention within Parrack's division. Moreover, Parrack asserts that IDS sought to destroy his credibility within his division by letting Parrack's subordinates know that Parrack was under investigation regarding his production with the company. Finally, Parrack maintains that his regional vice president attempted to pay a counselor Parrack was seeing to provide information to IDS directly concerning Parrack and "intentionally humiliated" Parrack by laughing at Parrack at the end of a meeting in which Parrack was terminated.

Plaintiff E.H. Poole claims that his regional vice president breached his confidence by disclosing the news of Poole's termination before Poole had an opportunity to inform his children of his changed professional status. Additionally, Poole points to the actions of his younger successor as being extreme and outrageous. Specifically, Poole cites his successor's disclosure to Poole's former subordinates that Poole had been told to resign or be fired, and that if Poole attempted to come back into his IDS offices he could be arrested for trespassing.

Plaintiff Donald Raes alleges that his regional vice president attempted to undermine his credibility by instructing Raes' subordinates that if they had any problems they could go directly to the regional vice president and bypass Raes. Additionally, Raes contends that his regional vice president showed no sympathy with respect to Raes's pending termination and made false promises regarding renewal commissions that Raes believed he had earned. Finally, Raes asserts that he encountered problems obtaining certain retirement benefits to which he was entitled.

Plaintiff Agnes Savadel maintains that IDS failed to recognize any of her positive accomplishments and displayed an unwillingness and inability to assist her financially even after she had repeatedly requested that she be given additional funds to assist her in meeting her division office expense obligations. Moreover, Savadel claims that when she left IDS "nobody said anything."

Plaintiff E.B. Sheppard claims that his regional vice president isolated him from other IDS employees by not asking him to give speeches and presentations at regional meetings. Sheppard further alleges that his regional vice president set quotas for him that were too high, accused him of having a "low energy level," and undermined his credibility as a manager by forc-

---

**71.** Mates claims that his subordinates' reference to him as "Hitler" and "hallway Hitler" was anti-Semitic. In support of this contention Mates argues that he is Jewish, that several of his family members were killed in the holocaust, and that his subordinates knew that he was Jewish. Mates' argument is unpersuasive. Mates himself acknowledges that the Hitler comments were not related to his ethnicity or religious convictions, but rather were used to describe his office management style and his business activities at IDS. *See* Pls.' Mem.Opp'n Summ.J. on Intentional Infliction Claims at 45, 45 n. 19, 48 (citing Barry Mates Dep. at 356–57; Clayton Frey Dep. at 18–19; Defs.' Mem.Supp. Summ.J. on the ADEA claims of LoMacchio, Trauth, Mates, Ladd and Vezner at 12).

ing him to fire and then rehire one of his subordinates.

Plaintiff Phillip Silver contends that senior IDS personnel encouraged him to leave his division manager position for a new consulting position with the company which turned out to be "a charade." Silver was also disconcerted by his regional vice president's failure to present him with a retirement gift or arrange a retirement party for him.

Plaintiff Thomas Sinyard maintains that his regional vice president made a number of representations to him that later turned out to be false. Specifically, Sinyard claims that his regional vice president informed him that he would have to invest a portion of his income back into his division, and that his net take home pay would not be less than $4,500.00 per month. According to Sinyard, both of those representations turned out to be false because Sinyard was required to reinvest a much larger portion of his income into his division than he had anticipated, and his net take home pay was substantially less than his regional vice president had indicated. Sinyard also alleges that his regional vice president accused him of lying to other senior IDS personnel and that his regional vice president intentionally humiliated Sinyard in front of his subordinates by undermining Sinyard's plan to promote one of his fellow employees.

Plaintiff Kenneth Solis claims that he was subjected to a series of events which led to his forced resignation. Specifically, Solis contends that his regional vice president terminated one of Solis's most productive district managers and divided a district in two. Moreover, Solis alleges that he was forced to rent more office space than he could pay for, was charged more for that space than he had anticipated, was required to pay a rent increase for utilities on that space four months sooner than he had expected, was subjected to unattainable production goals, and was susceptible to the competition's raiding of his personnel because IDS failed to provide him with accurate information about the competition.

Plaintiff Donald Stephens asserts that his regional vice president sent him mixed messages about recruiting priorities and delivered letters to senior IDS personnel containing critical evaluations of him. Stephens further claims that his regional vice president made a false promise to him regarding a potential return to his division manager position.

Plaintiff Grant Trauth maintains that IDS refused to reimburse him for office equipment that he had purchased with his own funds, failed to give him a fair role in the distribution of potential accounts from a large organizational client, and did not provide him with notice of or an explanation for his termination.

Plaintiff C. Thomas Turner alleges that IDS set production goals that were unattainable, conducted a compliance investigation into an account that one of Turner's division representatives had handled and thereafter censured Turner for the manner in which the account was handled, thereby leaving other IDS employees with the erroneous impression that Turner had "pocketed" money from his division. Additionally, Turner contends that IDS engaged in outrageous conduct with respect to his religious convictions[72] and employed the services of security guards in connection with his termination.

Plaintiff Kurt Vezner claims that his regional vice president set production goals which were unattainable, and failed to recognize Vezner's accomplishments.

72. Turner's allegations regarding IDS's conduct with respect to his religious convictions are somewhat involved. As an example of the "public ridicule" that he suffered at the hands of IDS, Turner points to IDS's 1986 sales conference in Nashville, Tennessee at which IDS hired a choir from Fisk University to sing at the opening of the conference. Turner maintains that although the music was gospel music, the original lyrics had been replaced so that the focus of the praise was IDS and its corporate parent, American Express. Turner further maintains that after the gospel music had been used to set the tone of the conference, the first speaker at the conference, an IDS senior vice president, utilized the religious inferences of the music to state: "I understand and hear that Tom Turner opens his divisional meetings like this every Monday morning." See Pls.' Mem.Opp'n Summ.J. on Intentional Infliction Claims at 162.

Plaintiff William Walters claims that the IDS home office instigated a negative letter writing campaign among Walters's subordinates that was aimed at undermining Walters's position as an IDS division manager. Moreover, Walters alleges that when IDS started pressuring him to resign, his regional vice president failed to support him.

Plaintiff Robert Wilber alleges that IDS set out to undermine his credibility and his ability to successfully manage his division. Specifically, Wilber points to IDS's failure to award him stock that he had earned during 1985. Wilber contends that senior IDS personnel told him that they were concerned that he might not be with the company long enough to obtain vested ownership of the stock, which required four years additional service with IDS. Moreover, Wilber maintains that his regional vice president engaged in a number of specific acts designed to destroy his ability to manage his division, including deliberately changing the time of meetings without telling Wilber and then accusing Wilber of forgetting the meetings, belittling Wilber by assigning him menial tasks such as picking up the regional vice president's dry cleaning, rearranging the furniture in Wilber's divisional office, and requiring Wilber to wrap a retirement gift for an IDS manager.

B. Discussion of Plaintiffs' Intentional Infliction of Emotional Distress Claims

▉▉▉ The parties agree that Minnesota law applies to plaintiffs' intentional infliction of emotional distress claims. Under Minnesota law, a plaintiff asserting a claim for intentional infliction of emotional distress must establish the following four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983) (citing *Restatement (Second) of Torts* § 46(1) (1965)).

▉▉ A plaintiff must meet a high threshold before a court will submit such a claim to a jury. *Corum v. Farm Credit Servs.*, 628 F.Supp. 707, 718 (D.Minn.1986) (citing *Hubbard*, 330 N.W.2d at 439); *Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 379 (Minn.Ct.App.1984)). As the four elements of an intentional infliction claim indicate, the "high threshold" that a plaintiff must meet is most distinctively manifest in the requirement that the conduct in question must have been "extreme and outrageous." This court has recognized that intentional infliction of emotional distress claims are "narrow in scope and limited to cases involving particularly egregious facts." *Price v. Viking Press, Inc.*, 625 F.Supp. 641, 650 (D.Minn. 1985) (applying Minnesota law). Indeed, the conduct in question must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard*, 330 N.W.2d at 439 (citing *Haagenson v. National Farmers Union Property & Casualty Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.1979) (citing *Restatement (Second) of Torts* § 46 cmt. d (1965)). Minnesota law requires plaintiffs to demonstrate such extreme conduct "to prevent fictitious and speculative claims." *Bohdan v. Alltool Mfg. Co.*, 411 N.W.2d 902, 908 (Minn.Ct.App.1987) (citing *Hubbard*, 330 N.W.2d at 439). The Minnesota Supreme Court has relied on the Second Restatement of Torts commentary in addressing intentional infliction of emotional distress claims. *See Hubbard*, 330 N.W.2d at 439 n. 8 (adopting theory of *Restatement (Second) of Torts* § 46(1) (1965)). Specifically, the Court has relied on the Second Restatement's commentary which "emphasizes the limited scope of this cause of action." *Id.* at 439.

▉▉▉ The conduct of an employer in discharging an employee may provide a sufficient basis for an intentional infliction of emotional distress claim. *See, e.g., Abston v. Levi Straus & Co.*, 684 F.Supp. 152, 157 (E.D.Tex.1987). It is also well settled that an intentional infliction of emotional distress claim may be predicated on conduct arising from the abuse of a position of authority. The Second Restatement of Torts provides that:

The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.

*Restatement (Second) of Torts* § 46 cmt. e (1965); *see also Venes v. Professional Serv. Bureau, Inc.*, 353 N.W.2d 671, 674 (Minn.Ct.App.1984) (quoting comment e).

■ Relying on comment e and case law from other jurisdictions, plaintiffs argue that employers such as IDS should be held to a "heightened standard" when evaluating intentional infliction of emotional distress claims. Plaintiffs cite *Hall v. May Dep't Stores Co.*, 292 Or. 131, 637 P.2d 126 (1981), for the proposition that a court must consider "whether the relationship between a defendant and the victim of the alleged tort is one that imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright or shock than would be true in arm's-length encounters among strangers." *Id.* 637 P.2d at 130. In *Hall*, the Oregon Supreme Court noted that "[t]he character of the relationship bears on the mental element required to impose liability ... and also on the next issue, the offensiveness of conduct that crosses the threshold of potential liability." *Id.* (citations omitted). Although *Hall* implies that the type of conduct required to maintain an intentional infliction claim varies with the nature of the relationship in which the conduct occurred, this implication is not substantiated by a thorough reading of *Hall* and the cases on which it relies. Specifically, with respect to "the offensiveness of conduct" that must be proved to maintain an intentional infliction claim, *Hall* cites *Pakos v. Clark*, 253 Or. 113, 453 P.2d 682 (1969). *Pakos*, in turn, clearly indicates that the standard set forth in the Second Restatement of Torts governs the offensiveness of the conduct that must be proved in order to avoid summary judgment on intentional infliction

claims. 453 P.2d at 686–88. Consequently, although an employer's interaction with and termination of an employee may give rise to conduct sufficient to support an intentional infliction of emotional distress claim, that conduct is still evaluated by the strict standard set forth in the Second Restatement of Torts and adopted by the Minnesota Supreme Court. This conclusion is buttressed by both the state and federal cases applying Minnesota law to intentional infliction of emotional distress claims arising out of an employment context. *See, e.g., Meyer v. Tenvoorde Motor Co.*, 714 F.Supp. 991, 994–95 (D.Minn.1989); *Corum*, 628 F.Supp. at 718–19; *Hubbard*, 330 N.W.2d at 437–40; *Eklund*, 351 N.W.2d at 378–79.

■ The court has closely examined the conduct on which the plaintiffs predicate their intentional infliction of emotional distress claims. There is no question that many of the acts in which IDS allegedly engaged were not in keeping with the highest standards of professionalism or even common courtesy. However, falling short of established standards of professionalism and courtesy is a far cry from engaging in conduct that is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community. Although much of IDS' alleged conduct is reprehensible, none of it can fairly be characterized as extreme and outrageous as those terms are used in the Second Restatement of Torts and Minnesota law.

Accordingly, none of the plaintiffs can satisfy the first requirement of an intentional infliction of emotional distress claim under Minnesota law and IDS's motion for summary judgment on those claims will be granted.[73]

12. *Defendants' Motion for Partial Summary Judgment on the Issue of Plaintiffs' Failure to Mitigate Damages*

IDS moves for partial summary judgment on plaintiffs' alleged failure to miti-

---

**73.** The court's conclusion should not be objectionable to plaintiffs Dean, Klukas, Learned, Lose, Novak, Raes, Sheppard, Silver, Solis, Stephens, Trauth or Vezner because those plaintiffs indicated in their responsive brief that they have agreed to voluntarily dismiss their claims for intentional infliction of emotional distress. *See* Pls.' Mem.Opp'n Summ.J. on Intentional Infliction Claims at 2.

gate damages, arguing that nine plaintiffs failed to make a good faith effort to seek comparable employment after leaving IDS.[74] IDS also seeks partial summary judgment on any claims for backpay asserted by those plaintiffs.

▮ Under the ADEA, a claimant wrongfully discharged must use reasonable efforts to mitigate damages. *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 809 (8th Cir.1982) (citing *Hegler v. Board of Educ.*, 447 F.2d 1078, 1080–81 (8th Cir.1971)). "[T]his burden [,however,] is not onerous and does not require success.... All that is required by law is an honest, good faith effort." *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir.1988) (citations omitted). Moreover, in evaluating whether a plaintiff has made reasonable efforts to mitigate damages, courts have held that a plaintiff has no obligation to accept lesser employment. *See, e.g., Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982). Nor is a plaintiff required to accept a demotion, go into another profession, *id.* at 231, 102 S.Ct. at 3065, or relocate to a new community. *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir.1983).

▮ IDS has the burden of proving that plaintiffs have not used reasonable efforts to mitigate their damages. *Hegler*, 447 F.2d at 1081. In addition to showing that plaintiffs failed to use reasonable care and diligence in seeking alternative employment, IDS must also prove that jobs were available that plaintiffs could have discovered and for which they were qualified. *Id.*

▮ IDS moves for summary judgment concerning nine plaintiffs who allegedly admitted that they failed to search for alternate employment. IDS contends that those admissions constitute plaintiffs' failure to mitigate as a matter of law. The court, however, disagrees with this contention and determines that IDS fails to meet its burden on the mitigation issue. There are material fact disputes concerning all of the plaintiffs' efforts to mitigate their damages, including the reasonableness of their efforts to obtain alternate employment and the availability of substantially equivalent jobs. Although IDS argues that plaintiffs have not exercised reasonable care and diligence to locate other positions, IDS has not provided evidence of other steps that plaintiff should have taken in their particular job market or evidence concerning the existence of substantially equivalent jobs available in the areas in which they lived. IDS's failure to provide the court with evidence on either of those points precludes summary judgment. *See Hegler*, 447 F.2d at 1081; *Coleman*, 714 F.2d at 808. The Eighth Circuit dealt with a similar situation in the *Coleman* case: the employer argued that the plaintiff failed to mitigate his damages because he "testified that he had not sought alternate employment." *Id.* The employer also presented evidence of the availability of at least three other jobs, although two of jobs would have required Coleman to move away from his home. *Id.* Despite Coleman's admission, the Eighth Circuit considered the evidence "sufficient to warrant presenting the [mitigation] question to the jury." *Id.*[75]

Based on the foregoing, the court denies IDS's motion for partial summary judg-

---

**74.** The nine plaintiffs are: Edward Chapdelaine, E. John Evans, Junior Klukas, John Lose, Robert Novak, E.H. Poole, Donald Raes, Phillip Silver and Robert Wilber. IDS claims that various other plaintiffs have also failed to mitigate, but it moves for summary judgment only on those plaintiffs who allegedly admitted their own failure to mitigate, thus failing to raise any material fact dispute.

**75.** IDS urges the court to accept the "egregious conduct" exception to the two-element formulation of its burden. Under this exception, the

employer does not have to prove job availability if the employer establishes an egregious failure by the employee to take reasonable steps to seek employment. IDS relies on various cases from other circuits to support this theory. The Eighth Circuit, however, has not addressed this exception and the court declines to adopt it in light of the Eighth Circuit's analysis in the *Coleman* case. Based on the evidence before the court, the court further concludes that IDS fails to demonstrate an egregious failure to mitigate on the part of any plaintiff.

ment on the issue of whether nine plaintiffs failed to mitigate damages.

13. *Defendants' Renewed Motion for Summary Judgment on Plaintiffs' Claims for Punitive Damages*

IDS moves for summary judgment on plaintiffs' punitive damages claims.[76] IDS's argument in support of its motion is threefold. First, IDS argues that plaintiffs have failed to comply with Minn.Stat. § 549.191 and cannot now properly amend their complaint to allege punitive damages. Second, IDS contends that even if the court permits such an untimely amendment, plaintiffs have failed to make a prima facie showing of entitlement to punitive damages. Finally, IDS maintains that because the court should grant summary judgment on all of the claims for intentional infliction of emotional distress, and because plaintiffs cannot maintain a separate claim for punitive damages under the ADEA, plaintiffs' claims for punitive damages should be dismissed because there is no cause of action on which to predicate those claims. After thoroughly scrutinizing plaintiffs' claims for punitive damages and the law applicable thereto, the court concludes that IDS's third argument in support of their motion for summary judgment is dispositive.

Plaintiffs argue that they should be allowed to maintain their punitive damages claims in connection with both their intentional infliction of emotional distress claims and their claims under the ADEA. As indicated above, summary judgment will be granted in favor of IDS on all of plaintiffs' claims for intentional infliction of emotional distress. Accordingly, plaintiffs may not assert claims for punitive damages on those claims.

When IDS first moved for summary judgment on plaintiffs' punitive damages claims, plaintiffs conceded that they could not predicate their punitive damages claims on their ADEA claims. (*See* (Pls.' Mem. Opp'n Summ.J. on Punitive Damages Claims, dated October 11, 1989, at 61). Since that time, however, the Seventh Circuit has decided a case that plaintiffs argue provides authority for allowing punitive damages for ADEA claims. In *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108 (7th Cir.1990), the Seventh Circuit addressed the availability of punitive damages under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 215(a)(3) (1988). After examining the language of the FLSA and the statutory history relating thereto, the court concluded that the 1977 amendment to the FLSA allowed for the recovery of punitive damages in actions brought under that statute. *Id.* at 111–12.

■ Both the ADEA and Supreme Court precedent indicate that the provisions of the ADEA that incorporate provisions of FLSA are to be interpreted in a manner consistent with the FLSA.[77] Plaintiffs therefore argue that in light of the Seventh Circuit's ruling in *Travis* that punitive damages are available under the FLSA, punitive damages should similarly be available under the ADEA. The court disagrees. At least five circuits have addressed the issue and have unanimously concluded that punitive damages are not available under the ADEA. *See, e.g., Espinueva v. Garrett,* 895 F.2d 1164, 1165 (7th Cir.1990); *Bruno v. Western Elec. Co.,* 829

---

**76.** IDS previously moved for summary judgment on plaintiffs' punitive damages claims. In its order dated April 5, 1990, the court denied IDS's motion pending a motion for summary judgment on the merits of plaintiffs' intentional infliction of emotional distress claims. *Glass v. IDS Fin. Servs.,* No. 4–89–76, slip. op. at 6–7 (D.Minn. April 5, 1990). As indicated above, IDS has now submitted, and the court granted that motion. IDS renews its motion for summary judgment on plaintiffs' claims for punitive damages and that motion is now ripe for decision.

**77.** For example, 29 U.S.C. § 626(b) provides that the ADEA "shall be enforced in accordance with the powers, remedies and procedures provided in [applicable sections of the FLSA]." Similarly, in *Lorillard v. Pons,* the Supreme Court stated that "but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA [into the ADEA]." 434 U.S. 575, 582, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978).

F.2d 957, 966–67 (10th Cir.1987); *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 147–48 (2d Cir.1984); *Walker v. Pettit Constr. Co.*, 605 F.2d 128, 130 (4th Cir.1979); *Dean v. American Sec. Ins. Co.*, 559 F.2d 1036, 1039–40 (5th Cir.1977).

Of particular significance to the instant dispute is the Seventh Circuit's opinion in *Espinueva*. The Seventh Circuit specifically held that "[n]either Title VII nor the ADEA authorizes awards of compensatory or punitive damages, as opposed to 'equitable' relief such as reinstatement and back pay." 895 F.2d at 1165 (citing *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235 (7th Cir.1989) and *Smith v. OPM*, 778 F.2d 258, 262 (5th Cir.1985)).[78] Moreover, *Espinueva* is helpful because the Seventh Circuit handed down its decision in that case just eleven and one-half months prior to its opinion in *Travis*.[79] Additionally, no changes in the wording of the ADEA or the Seventh Circuit case law on that issue have occurred since *Espinueva* was decided. Consideration of all these factors and the reasoning contained in the circuit court opinions addressing the availability of punitive damages under the ADEA lead the court to the conclusion that *Travis* was not intended to nor does it change the law under the ADEA. Accordingly, plaintiffs may not assert punitive damages claims predicated on their ADEA claims.

Based on the foregoing, the court concludes that the only claims on which plaintiffs could base their punitive damages claims are their intentional infliction of emotional distress claims. Because the court grants IDS's motion for summary judgment on plaintiffs' intentional infliction claims, however, plaintiffs do not have any underlying claims on which to predicate their punitive damages claims. Consequently, the court grants IDS's motion for summary judgment on plaintiffs' punitive damages claims.

### 14. *Defendants' Motion for Partial Summary Judgment on the Scope of the Class*

IDS moves to dismiss the claims of various plaintiffs from the certified class. It first contends that fifteen plaintiffs who continued to work at IDS after Glass filed his charge in the fall of 1986 and who also failed to file their own timely administrative charges must be dismissed from the class.[80] IDS further contends that Glass lacks standing to assert various claims on behalf of himself or others for injuries that IDS characterizes as different from those that he himself suffered. The court will address each argument in turn.

■■■■ IDS first argues that Glass's charge was filed too early to permit various plaintiffs to piggyback on that charge. An individual charge that is itself timely is deemed sufficient to permit piggybacking as long as it provides the EEOC and employer with an opportunity to conciliate and provides sufficient notice to inform "the employer that the consequences of an individual plaintiff's charge may 'transcend[ ] an insolated [sic] individual claims.' " *Kloos*, 799 F.2d at 400 (citations omitted); *see also Ulvin v. Northwestern Nat'l Life Ins. Co.*, 943 F.2d 862, 864 (8th Cir.1980)

---

**78.** The court is somewhat concerned by the Seventh Circuit's reliance on *Smith v. OPM* because that case does not directly support the proposition for which it is cited. However, in light of the overwhelming authority in support of the proposition that punitive damages are not available under the ADEA, including *Dean v. American Ins. Co.*, 559 F.2d 1036, 1039–40 (5th Cir. 1977), the court concludes that the proposition set forth in *Espinueva* is well supported and correct.

**79.** *Espinueva* is also of import to the instant dispute because Judge Easterbrook, who wrote the *Travis* opinion, also authored *Espinueva*. Judge Cudahy joined in both opinions.

**80.** The plaintiffs subject to this motion are: Rosevelt Bass, Richard Dean, D. Vincent Enright, E. John Evans, C. Donald Ladd, Thomas LoMacchio, John Lose, Robert Novak, E.H. Poole, E.B. Sheppard, Phillip Silver, Thomas Sinyard, J. Grant Trauth, C. Thomas Turner and Robert Wilber. IDS moved in the alternative to exclude those plaintiffs from the class in the event that its motion for partial summary judgment on the sufficiency of the Glass charge was denied. The court denies that motion, *see supra*, thus it will address IDS's scope of class motion.

(citing *Kloos* for proposition that piggybacking should be permitted "where at least one plaintiff files a timely charge"); *Anderson v. Montgomery Ward & Co.,* 852 F.2d 1008, 1017 (7th Cir.1988) (permitting opt-in plaintiffs who could not or did not file timely charges to nevertheless piggyback on the charges that were timely filed); *Church v. Consolidated Freightways, Inc.,* 137 F.R.D. 294, 309 (N.D.Cal. 1991) (persons subject to ongoing discriminatory practice may properly piggyback on earlier charges even though their injuries occurred after the earlier charges were filed); *Levine v. Bryant,* 700 F.Supp. 949, 956–57 (N.D.Ill.1988) (permitting piggybacking of claims occurring after charge was filed and rejecting as specious argument that earlier charge did not give employer adequate notice of those later claims). It is undisputed that Glass's charge was itself timely. As discussed above, Mrs. Glass's reference to the situation in four other division offices coupled with the contents of the intake questionnaire may have been sufficient to provide ICRC, and absent ICRC's mishandling, IDS, with sufficient notice and an opportunity to conciliate all of the class claims. The court thus rejects IDS's claim that the Glass charge did not provide sufficient notice as a matter of law.

 IDS also seeks to limit the scope of the class to those plaintiffs who allege discriminatory acts within the "same time frame" as Glass's claim. IDS further contends that administrative charges filed by eight plaintiffs in 1989 and 1990 cannot revive discrimination claims that had already become time-barred by the time that those later charges were filed.[81] IDS argues that the claims of twenty-three plaintiffs became time-barred in this fashion in 1986, 1987 and 1988, and that those plaintiffs must be dismissed unless they can piggyback on Glass's charge. This argument, however, ignores the effect of plaintiffs' allegations concerning the existence of a pattern or practice of discrimination.[82] If proven, such a pattern or practice will operate to suspend the limitations period for filing charges until such time that the pattern or practice actually terminated. In *International Brotherhood of Electrical Workers, Local 1439 v. Union Electric Co.,* the Eighth Circuit held that plaintiffs' charges were timely despite the fact that plaintiffs were aware of the company's allegedly unlawful practice for years before they filed their charges. 761 F.2d 1257, 1258 n. 1 (8th Cir.1985). The Eighth Circuit reasoned that:

> Because the company's practice, if unlawful, was a continuing practice, we conclude that the relevant law for calculating the time period [for filing charges] is the termination of the allegedly unlawful practice.... Because the Company is still maintaining the challenged [unlawful practice], the alleged violation is continuing and the [plaintiffs] charges were timely filed [for purposes of the ADEA].

*Id.* In the present case, plaintiffs alleged that IDS's age discrimination practice continued at least until the time that plaintiffs filed the present lawsuit in 1989. Under the reasoning of *International Brotherhood of Electrical Workers,* the time to calculate the charge-filing period would not begin to run until IDS actually terminated the allegedly unlawful practice. Thus,

---

**81.** Eight plaintiffs filed administrative charges in 1989 and 1990 alleging a company-wide pattern or practice of age discrimination: Truman Crabbe, Roger Huebner, C. Donald Ladd, Barry Mates, Gayle Parrack, Donald E. Raes, Agnes Savadel and Donald Stephens.

**82.** IDS contends that plaintiffs in essence ask the court to judicially repeal Section 626 of the ADEA, which requires individuals to file an administrative charge within 300 days of receiving notice of a discriminatory act. A pattern or practice of age discrimination, however, does toll the charge filing period as long as the pattern or practice continues. *International Brotherhood,* 761 F.2d at 1258 n. 1. Where an employer maintains a continuing violation, such a practice may be characterized as a "conscious waiver of limitations period protection.... [And that] employer ... neither deserves nor obtains repose." *Home Insurance Co.,* 553 F.Supp. at 713. All of the cases on which IDS relies are inapposite based on plaintiffs' allegations and evidence of an ongoing pattern or practice of age discrimination. *See International Brotherhood,* 761 F.2d at 1258 n. 1.

IDS's assertion that the claims of various plaintiffs are time-barred is premature until a jury determines whether IDS engaged in a pattern or practice of discrimination and if so, when that practice ended. Depending on the answers to those two questions, plaintiffs may also be able to piggyback on the administrative charges that were filed in 1989 and 1990. Based on the foregoing, the court rejects IDS's claim that the plaintiffs subject to this motion do not fall within the appropriate temporal scope of the class, rejects IDS's narrow definition of the relevant time frame and determines that a jury must evaluate the pattern or practice evidence to ascertain when the charge-filing period began to run. Thus, IDS's motion for partial summary judgment based on untimeliness of Glass's charge is denied.

■■■ IDS also contends that Glass lacks standing to assert claims on behalf of himself or others for injuries "different" than those alleged by Glass himself. IDS assumes that Glass's charge included class allegations for purposes of this motion only, but argues that Glass nonetheless lacked standing to assert the following claims:

1. E. John Evans, John Lose, Robert Novak and E.H. Poole, all of whom allege forced retirement;

2. Rosevelt Bass, Edward J. Chapdelaine, Junior Klukas, Gerald Learned, Phillip Silver, Thomas Sinyard, Williams A. Walters and Robert Wilber, all of whom allege constructive discharge;

3. Thomas LoMacchio, J. Grant Trauth and Carolyn Treaster, all of whom were allegedly discharged but not replaced or were replaced by older employees; and

4. Rosevelt Bass, Richard Dean, D. Vincent Enright, E. John Evans, Gerald Gant, Maurice Harrington, C. Donald Ladd, Thomas LoMacchio, John Lose, Robert Novak, E.H. Poole, E.P. Sheppard, Phillip Silver, Thomas Sinyard, J. Grant Trauth, Kurt Vezner, William Walters and Robert Wilber, to the extent that each seeks chargeback damages.[83]

IDS seeks to limit the class to those persons who specifically allege discrimination based on demotion to a district manager position and replacement by a younger person, the exact mechanism by which Glass was removed from his position as division manager, thus requiring strict symmetry between Glass's charge and the claims of the opt-in plaintiffs. This, however, is not the standard by which to measure a class representative's standing to assert ADEA class claims. *See Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D.Tex.1979) (plaintiffs are not required to show that their positions are identical). In examining this issue, courts apply a "sufficiently similar" standard to determine whether noncomplying plaintiffs may piggyback on a complying plaintiff's charge or complaint. *See, e.g., Sperling v. Hoffmann–La Roche, Inc.*, 118 F.R.D. 392, 399 (D.N.J.1988), *aff'd in part on other grounds and appeal dismissed in part on other grounds*, 862 F.2d 439 (3d Cir.), *aff'd and remanded on other grounds*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 443 (N.D.Ill. 1982).[84] In *Sperling*, the proposed class

---

**83.** The court does not reach these allegations because it grants IDS's motions for summary judgment on plaintiffs' chargeback claims. *See supra.*

**84.** Authorization for class actions under the ADEA is found in 29 U.S.C. § 626(b). Section 626(b) adopts by reference the enforcement mechanism for class actions set forth in the Fair Labor Standards Act, which provides that:

An action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (1988); *see LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 288–89 (5th Cir.1975) (per curiam) (ADEA class actions follow opt-in procedure in FSLA, not the opt-out mechanism of Federal Rule of Civil Procedure 23). Thus, an ADEA plaintiff may assert a class action on behalf of other employees if those employees are "similarly situated" and also file written consents to join the action.

Courts have also applied the single filing rule to permit nonfiling claimants to join Title VII actions when at least one plaintiff has filed a

members alleged "a single decision, policy, or plan" of age discrimination that "led to the termination or demotion of every member of the class." *Sperling*, 118 F.R.D. at 406. The district court found that plaintiff's allegations were sufficient to show that proposed class members were similarly situated, noting that the standard "appear[s] to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Id.* at 407 (citing cases). The *Allen* court also found that a proposed class met the standard because the named plaintiffs alleged:

> a campaign of discrimination by [the defendant] which transcends minor differences in their levels of management responsibilities, geographic location, and dates of alleged discriminatory actions.... [T]he focus of a trial ... will be the allegation that the defendant orchestrated a 'campaign to rid [itself] of its older employees because of their age.' Differences in the particular adverse consequences (of this campaign) that different individuals allege—whether discharge, forced early retirement, demotion, or transfer to a dead-end job—will be relevant primarily to the computation of damages.

93 F.R.D. at 443. When seeking certification for the present class, plaintiffs alleged the following nexus of facts to demonstrate that the proposed class members were in a situation similar to Glass:

1. IDS employed each plaintiff in the same position, that of division manager;
2. As division managers, each plaintiff performed the same job function and had essentially the same job responsibilities;
3. IDS compensated each plaintiff in essentially the same manner;
4. IDS evaluated each division manager in a similar manner and using the same objective performance criteria;

5. IDS either terminated, demoted, or forced each plaintiff to resign or retire during the same five-year period of time;
6. Most of the proposed class members had been employed by or associated with IDS for a long period of time;
7. All plaintiffs claim similar injuries, that they were terminated, demoted, or forced to resign or retire as part of the same pattern or practice of age discrimination at IDS in the period from 1984 through 1989; and
8. That plaintiffs were generally long-term IDS employees who had been satisfactorily performing their jobs as division managers and that plaintiffs were replaced by much less experienced, and in every case but two, by much younger individuals.

Plaintiffs also proffer direct evidence that IDS engaged in a deliberate, widespread pattern and practice of age discrimination. Based on the foregoing, the court finds that plaintiffs have alleged sufficient facts to satisfy the similarly situated standard and that Glass had standing to assert the class claims.

██ The court also concludes that IDS's reliance on *Ulvin* is misplaced. The proposed *Ulvin* class was marked dissimilar. Proposed class members were employed by the named defendant and its subsidiary in a wide variety of jobs: messenger, claims examiner, microfilmer, branch manager, service representative, secretary, administrative assistant, order clerk, and vice president. Without any evidence of a common plan or scheme to discriminate, the *Ulvin* class had virtual no factual nexus. This court therefore refused to certify a class in *Ulvin* based on its express finding that there was no evidence of a company-wide pattern or practice of age discrimination. *Ulvin v. Northwestern Nat'l Life*, Nos. 3–88–730, 3–88–793, slip op. at 3 (D.Minn. Aug. 8, 1991). Plaintiffs in the present case all held identical positions with the same job require-

valid EEOC charge and the individual claims of the filing and nonfiling plaintiffs arose out of "similar discriminatory treatment." *See, e.g.,*

*Jackson v. Seaboard Coastline R.R. Co.,* 678 F.2d 992, 1011–12 (11th Cir.1989).

ments, same company employer, same national performance standards, and a similar compensation system. Moreover, plaintiffs proffer significant evidence that they were injured as a result of the same deliberate pattern or practice of age discrimination. *See Sperling,* 118 F.R.D. at 407 (key inquiry for determining whether class members are "similarly situated" is whether they were victims of a "single decision, policy, or plan" of age discrimination).

The situation in *Ulvin* is further distinguishable because the EEOC was not a plaintiff in that action. The EEOC's power to bring a direct suit rests on two sections of the ADEA, 29 U.S.C. §§ 216(c) & 217, which do not contain the "similarly situated" standard applicable to private suits brought pursuit to 29 U.S.C. § 216(b). *See Donovan v. University of Texas at El Paso,* 643 F.2d 1201, 1203–04 (5th Cir.1981). As previously discussed, the court finds no reason to apply a different rule to cases in which the EEOC intervenes rather than bringing its own direct action. As a result of its participation in the present case, the EEOC also gave IDS actual notice of the thirty-two individual and pattern and practice claims that would be litigated if the EEOC filed suit. The EEOC further provided IDS with an actual opportunity to conciliate all of the class members' claims, encompassing each of the specific mechanisms by which IDS allegedly implemented its pattern or practice of age discrimination. IDS nonetheless rejected every opportunity. In *Ulvin,* there was no indication that the employer ever rejected any offers to conciliate or had any notice of the existence of class claims based on its formal early retirement program. The court therefore finds the present case distinguishable.

Based on the foregoing, the court denies IDS's motion for partial summary judgment on the scope of the class.

15. *Defendants' Motion to Decertify the Class*

■ IDS also moves for decertification based on its contention that plaintiffs are not similarly situated. As previously discussed, plaintiffs allege a nucleus of facts that the court determines is sufficient to maintain a class action under the "similarly situated" standard. IDS nonetheless focuses on various factual distinctions, including its individualized defenses, to argue that the class should be decertified. The court, however, determines that similar fact situations and legal issues predominate over those individual facts and thus a class action is the most appropriate mechanism for prosecuting the present action. *See Lusardi v. Lechner,* 855 F.2d 1062, 1074–75 (3d Cir.1988) (determining whether class action is inappropriate in light of disparate, individual defenses is within the trial court's discretion); *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 52 (3d Cir.1989) (explicitly rejecting the argument that class certification is improper when the defendant employer raises separate ADEA defenses concerning each individual class member). The court finds that plaintiffs' allegations of a pattern or practice of age discrimination play a major role in all of plaintiffs' claims; to require each plaintiff to prove those allegations individually, as opposed to proffering the pattern or practice evidence just once in a representative action, would be an inefficient use of judicial resources. *See, e.g., Plummer v. General Elec. Co.,* 93 F.R.D. 311, 312 (E.D.Pa.1981). The court further determines that a class action will effectuate the remedial purpose of the ADEA because it will permit plaintiffs to lower their individual costs by pooling their resources to prosecute their age discrimination claims. *See Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989). Although IDS contends that decertification would protect its due process rights, the court finds that the pattern and practice evidence should be presented on a class-wide basis to protect the due process rights of the plaintiffs. The individual plaintiffs are less able to bear the cost of separate trials because they have fewer resources than IDS and a class action will give them a fair and full opportunity to adjudicate their claims. Plaintiffs further argue that IDS may be tempted to use its vast financial resources to overwhelm individual plaintiffs. The court

therefore concludes that a class action is the most fair and efficient way to resolve the present lawsuit and denies IDS's motion to decertify the class.

### 16. *Defendants' Motion for Separate Trials*

IDS moves for separate trials on various nondiscrimination claims, but asserts that this motion will be largely mooted if plaintiffs' intentional infliction of emotional distress claims are dismissed. Based on the court's decision to grant IDS's motion for summary judgment on the emotional distress claims, coupled with IDS's admission that such a determination will largely moot this nebulous motion, the court denies IDS's motion for separate trials.

### 17. *Plaintiffs' Motion for A Trial Date Certain*

This motion is granted to the extent that the court previously granted it at the hearing, that is, this case will proceed as any other case according to the dictates of the court's trial calendar.

### 18. *Plaintiffs' Motion to Strike Expert Testimony*

Plaintiffs move to strike the testimony of experts Janis S. Tweedy and Richard L. Brunelle because IDS disclosed their testimony eight months after it ostensibly made full and complete disclosure of its expert witnesses pursuant to the court's pretrial order. Plaintiffs further note that IDS disclosed the testimony on the last working day before plaintiffs were required to file their responsive memoranda. Based on this delay and IDS's inadequate showing of extreme good cause to support any extension, the court determines that the testimony of Tweedy and Brunelle should be struck and grants plaintiffs' motion.[85]

### 19. *Plaintiff Edward Chapdelaine's Motion for Summary Judgment on Defendants' Counterclaims Against Him*

■ IDS prohibits its financial planners from selling investments from sources oth-

er than IDS. Beginning in 1984, three planners in plaintiff Edward Chapdelaine's ("Chapdelaine") division began to sell fraudulent securities in an elaborate securities fraud scheme called J & J Syndicate. That scheme ultimately cost investors roughly two million dollars in losses. Chapdelaine discovered that the planners were selling J & J securities in June of 1986 yet never reported his discovery to IDS or to any governmental agency. As a result of the J & J scheme, the State of New Jersey threatened to begin proceedings against IDS that could have resulted in the loss of IDS's license to engage in the securities business in New Jersey. IDS also feared a class action lawsuit brought on behalf of the J & J investors. IDS thus decided to settle with the State in May 1990, agreeing to reimburse J & J investors for approximately $1.2 million.

As a result of the J & J scheme, IDS's asserts a four-count counterclaim against Chapdelaine, alleging: (1) breach of contract; (2) negligent hiring, recruiting and supervision; (3) misrepresentation; and (4) contribution and indemnity. Chapdelaine first contends that IDS's counterclaim should be dismissed in its entirety because it constitutes illegal retaliation under the ADEA. As discussed above, Chapdelaine fails to raise a material fact dispute regarding IDS's retaliatory intent and the court denies his motion to the extent it is based on allegations of retaliation.

Although Chapdelaine ostensibly moves for summary judgment on all four counts of IDS's counterclaim, IDS claims that Chapdelaine actually seeks summary judgment solely on its claim for contribution and indemnity. Chapdelaine contends, however, that even though IDS alleges four separate bases for relief, that IDS only seeks damages incurred when it reimbursed J & J investors as a result of its settlement with New Jersey. Chapdelaine thus argues that IDS's counterclaim represents nothing more than a claim for contri-

---

**85.** Plaintiffs also request that the court sanction IDS for abuse of the discovery and dispositive motion process as a result of the late disclosure. The court declines to sanction IDS on this basis.

bution and indemnity and urges the court to apply the law of contribution and indemnity to analyze IDS's entire counterclaim. The court finds, however, that the three other claims, for breach of contract, negligent hiring, recruiting and supervising, and misrepresentation, are well-grounded in fact and law and declines to apply the law of indemnity and contribution to those claims. Thus, Chapdelaine's motion for summary judgment is denied to the extent that it applies to those three claims.

■■■ Turning to IDS's fourth claim for contribution and indemnity based on the J & J settlement, Chapdelaine contends that summary judgment must be granted because IDS has continually denied any legal liability and thus voluntarily paid those losses. Chapdelaine argues that because IDS had no legal liability, under Minnesota law, it may not seek contribution and indemnity from Chapdelaine.[86]

> Minnesota law imposes two threshold requirements on the right to sue for contribution: the parties must share a common liability or burden, and the plaintiff must have discharged more than his fair share of the common liability or burden.

*In re Westerhoff*, 688 F.2d 62, 63 (8th Cir. 1982) (applying Minnesota law and citing *Canosia Township v. Grand Lake Town-*

*ship*, 80 Minn. 357, 83 N.W. 346, 344 (1900) (footnote omitted)).[87]

> [T]he requirement of common liability was interposed to guarantee that contribution be recovered only from a party who is liable for the damages already satisfied by the party seeking contribution.

*Samuelson v. Chicago, Rock Island & Pac. R.R. Co.*, 287 Minn. 264, 178 N.W.2d 620, 623 (1970). Minnesota courts permit a party to assert a claim for contribution or indemnity even if it settled a claim rather than adjudicating its liability. *Id.* 178 N.W.2d at 624 (it would be unjust enrichment to allow a party, who may have been found solely liable, to avoid contribution because another party settled rather than adjudicated its liability); *see also Lemmer v. IDS Properties, Inc.*, 304 N.W.2d 864, 869 (Minn.1980) (settling defendant entitled to indemnity even though jury eventually found that it was not negligent). When seeking contribution or indemnity in the context of a settlement agreement before trial, the party seeking such indemnification must demonstrate two things: that the settlement amount was reasonable and prudent, and that the party could have been held liable for that settlement amount. *Osgood v. Medical, Inc.*, 415 N.W.2d 896, 903 (Minn.Ct.App.1987).[88] Thus, to prove a

---

**86.** Chapdelaine contends that Minnesota law governs all counts of IDS's counterclaim. IDS agrees that Minnesota law governs its breach of contract claim, but does not concede that Minnesota law controls its other claims. However, IDS agrees that for purposes of this motion only, the court should apply Minnesota law to all four counts of its counterclaim.

**87.** Under Minnesota law:

> contribution is an equitable action for the restitution of part of the amount paid by one party in satisfaction of an obligation owed jointly with the other party, while indemnity is the corresponding action for restitution of the whole amount paid by one party in satisfaction of an obligation of the other party. Both actions are based upon equitable principles of fairness: Parties who share liability for an injury should recompense that injury equally or, if not equally liable, in proportion to their liability.

*Samuelson v. Chicago, Rock Island & Pacific R.R. Co.*, 287 Minn. 264, 267, 178 N.W.2d 620, 623 (1970) (footnote omitted) (citing *Hendrick-*

*son v. Minnesota Power & Light Co.*, 258 Minn. 368, 104 N.W.2d 843 (1960)).

**88.** The parties dispute the level of liability required for this inquiry. Chapdelaine contends that IDS must prove that it was actually liable for the J & J losses before it may recover contribution or indemnity. IDS argues, however, that it satisfies its burden merely by proving that its settlement was reasonable and that it does not have to prove any level of liability. The court first finds that the cases on which IDS relies are distinguishable because they all involved parties who had written indemnity contracts, a factor that is not present here and which makes the actual liability requirement superfluous.

Contribution, however, is an equitable remedy and the common liability requirement may be subject to modification if it is necessary to achieve an equitable result. *See, e.g., Hart v. Cessna Aircraft Co.*, 276 N.W.2d 166, 168 (Minn. 1979). It is undisputed, however, that IDS settled the J & J investors' claims without providing Chapdelaine with either notice of the settlement or an opportunity to participate in those

claim for indemnity, IDS must show that its settlement with the State of New Jersey was reasonable and that it could have been actually liable to the J & J investors for the amount that it paid in settlement. *See, e.g., Minneapolis Mill Co. v. Wheeler,* 31 Minn. 121, 16 N.W. 698 (1883). Examining the first requirement:

> The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim. This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claims, as well as the risks of going to trial.

*Miller v. Shugart,* 316 N.W.2d 729, 735 (Minn.1982). The court finds that the present record is insufficient to determine the reasonableness of IDS's settlement.

Turning to the liability inquiry, the court first rejects Chapdelaine's contention that IDS was not legally liable solely because it denies any liability for the J & J scheme; the fact that IDS denied such liability does not mean that a jury could not have found IDS liable to the investors. The court further rejects Chapdelaine's contention that IDS volunteered to settle the J & J claims. IDS settled with the State of New Jersey to avoid a class action lawsuit with the J & J investors and an administrative proceeding by the New Jersey Bureau of Securities, both of which created a serious risk of loss or sanctions for IDS. As the Minnesota Supreme Court held:

> [t]he fact that plaintiff made payment only when faced with an imminent trial ... and a potentially large verdict ... negates any inference that plaintiff was acting as a volunteer in the sense that would ... render it without remedy in contribution.

*Lametti v. Peter Lametti Constr. Co.,* 305 Minn. 72, 232 N.W.2d 435, 439 (1975). The

State of New Jersey also found that Chapdelaine failed "to reasonably supervise the activities" of the IDS employees involved, and thus there is a strong possibility that IDS would have been found vicariously liable for those losses. *Restatement (Second) of Agency* § 219(1) (1957); *cf. Pischke v. Kellen,* 384 N.W.2d 201, 205 (Minn.Ct. App.1986) (party who is only vicariously liable is entitled to full indemnity from the party who caused the injury) (citing *Polaris Indus. v. Plastics, Inc.,* 299 N.W.2d 414, 420 (Minn.1980)). The court finds that the present record is insufficient to determine whether IDS could have been liable for the J & J investors' losses.

Based on the foregoing, the court concludes that material fact disputes exist regarding the reasonableness of IDS's settlement and also the existence and proportion of liability between IDS and Chapdelaine. *See Duluth, M. & N. Ry. Co. v. McCarthy,* 183 Minn. 414, 236 N.W. 766, 768 (1931) (whether settlement was voluntary and reasonable " 'are issues of fact to be raised by the pleadings and determined upon a trial on the action' " (citations omitted)). Thus, Chapdelaine's motion for summary judgment on IDS's claim for contribution and indemnity is denied.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' motion for dispositive sanctions is denied;

2. Defendants' motion for partial summary judgment concerning the sufficiency of the Glass charge is denied;

3. Defendants' motion for summary judgment on equitable tolling is granted;

4. Defendants' motion to dismiss the EEOC's complaint in intervention or to limit the EEOC's participation is denied;

5. Defendants' motion for summary judgment on the claims of plaintiffs Chapdelaine, Silver and Treaster is denied;

---

settlement negotiations. Given this failure, the court finds that there is no equitable reason to eliminate or modify the common liability requirement.

IDS further argues that if the court determines that a liability component exists, it only need demonstrate that it could have been liable

for those losses, and not that it was actually liable, to satisfy its burden. Because the court determines that a material fact dispute exists under either standard, the court assumes without deciding that the standard of "could have been liable" is correct.

6. Defendants' motion for summary judgment on constructive discharge is denied;

7. Defendants' motion for summary judgment on the ADEA claims of plaintiffs Lomacchio, Trauth, Mates, Ladd and Vezner is denied;

8. Defendants' motion for summary judgment on plaintiffs' retaliation claims is granted in part and denied in part;

9. Defendants' motion for summary judgment on plaintiffs' ERISA claims contained in Count III of the complaints is granted;

10. Defendants' motion for summary judgment on plaintiffs' wrongful chargeback claims based on state law is granted;

11. Defendants' motion for summary judgment on the claims for intentional infliction of emotional distress of plaintiffs Bass, Enright, Evans, Gant, Glass, Harrington, Huebner, Ladd, LoMacchio, Mates, Parrack, Poole, Savadel, Sinyard, Turner, Walters and Wilber is granted and the claims for intentional infliction of emotional distress of plaintiffs Dean, Klukas, Learned, Lose, Novak, Raes, Sheppard, Silver, Solis, Stephens, Trauth and Vezner are dismissed with prejudice;

12. Defendants' motion for partial summary judgment on the alleged failure of nine plaintiffs' to mitigate damages is denied;

13. Defendants' motion for summary judgment on plaintiffs' claims for punitive damages is granted;

14. Defendants' motion for partial summary judgment on the scope of the class is denied;

15. Defendants' motion for class decertification is denied;

16. Defendants' motion for separate trials is denied;

17. Plaintiffs' motion to strike the affidavits of Richard Brunelle and Janis Tweedy is granted;

18. Plaintiff Edward Chapdelaine's motion for summary judgment on defendants' counterclaim is denied;

19. Plaintiffs' motion for a trial day certain is granted to the extent that the court granted that motion at the hearing;

20. Plaintiffs' motion for summary judgment on their claims regarding the career distributor's retirement plan is denied; and

21. Plaintiffs' motion for partial summary judgment on defendants' PVS chargebacks is denied.